**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**David Edward MASPERO, Frank Mejia
Ruiz, and Roger Pacheco, Defend-
ants-Appellants.**

**No. 73-2741.**

United States Court of Appeals,
Fifth Circuit.

July 15, 1974.

Rehearings Denied Sept. 12, 1974.

Anthony Nicholas, C. Thomas Behrman, San Antonio, Tex., for defendants-appellants.

William S. Sessions, U. S. Atty., Joel D. Conant, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before WISDOM, AINSWORTH and GODBOLD, Circuit Judges.

GODBOLD, Circuit Judge:

The appellants were convicted under two counts relating to 2,900 pounds of marijuana, Count One, conspiracy to import and to possess with intent to distribute, and Count Four, possession with intent to distribute.[1] They question the validity of searches of the trailer in which the marijuana was found and the sufficiency of the evidence to support their convictions.

## I. The searches.

There was evidence before the court when it denied motions to suppress on the basis of which it could conclude that the following fact situation existed. At approximately 1:30 p. m. a BNDD agent in San Antonio, Texas, received information from a confidential informant of proven prior reliability that a tractor-trailer rig had come in from Mexico that day with 2,300 pounds of marijuana in a false compartment underneath the floor of the trailer. The informant supplied the license number of the trailer and described markings on the tractor. He told the agent that the rig was parked at the location of a truck refrigeration sales and service company in San Antonio and that it was to be driven a short distance out of the city and unloaded. The informant then went with that agent and other agents to the refrigeration company and at approximately 1:45 pointed out the rig parked in a fenced compound. The agents wanted to determine the license number on the tractor and find out if there was a back exit to the fenced area. Afraid to walk in, they drove through the area in a car but could not see the truck license. They then determined to try to get closer to the rig through the owner of the refrigeration company. They ascertained by telephone that he was a person of good reputation and with no narcotics record. They talked to him and told him the situation. The owner related that work was to be performed on the refrigeration unit of the trailer, and after investigating, he told agents that the rig was "ready to roll" and should be leaving at any time. This information was imparted around 2:45 or 3:00 p. m. The owner suggested that the agents pose as interested buyers of refrigerated trailers and in that guise examine the rig. The work to be done necessitated movement of workmen in and out of the trailer. The owner and two agents inspected two or three other units, then approached the rig in question, and the owner opened the trailer doors, which were secured by a hasp but not locked. This occurred around 2:45–3:00 p. m. and after the agents were told that the rig might

---

1. Two other defendants, Raul and Roberto Vasquez-Villalobos, brothers, were fugitives at the time of trial. Both were Mexican nationals. Raul was identified as a millionaire owner of a Mexican trucking operation, Roberto as a Mexican customs officer.

depart at any time. Without entering, both agents saw marijuana seeds on the floor, described as "several handfuls" and "all over the floor of the trailer." The agents climbed in, remained a short while, and climbed out. One of the agents could smell the odor of marijuana.

There was adequate probable cause to believe that the trailer was being used to transport marijuana. Indeed appellants do not contend otherwise but rather focus upon alleged absence of exigent circumstances. The time span from identification of the rig at the refrigeration company to the actual entry into the trailer was approximately an hour to an hour and 15 minutes. By the time the entry was made there were 8 to 10 agents in the vicinity working on the case. In addition to their actions already described, they were doing a number of things—checking the license numbers of cars parked in the vicinity and attempting to determine if the persons in whose names they were registered had narcotics records, tailing cars as they left the scene, following on foot persons leaving the area—all for the purpose of trying to determine if there was either a buyer or a seller of the marijuana in the vicinity.

It would have taken approximately two hours for an agent on the scene to drive to the federal courthouse, obtain a search warrant and return, driving time alone requiring approximately 30 minutes.

■ The foregoing evidence, especially the information imparted to the agents that departure of the tractor-trailer rig could be imminent, authorized them to enter the trailer. The search was valid. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). Although not actually upon the open road when searched, the truck was in a semi-public place and had easy and immediate access to the road. Thus it clearly was not immobilized like the car in Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). It was not merely potentially moveable; there was a real possibility of its moving at any time. See Note, Warrantless Searches and Seizures of Automobiles, 87 Harv.L.Rev. 835, 842–843 (1974).

As it turned out the rig did not depart the refrigeration company area immediately. During the afternoon its driver, Victoriano Compean left several times and was picked up by car and brought back. Around 5:45 he drove the rig out of the fenced compound and parked it a short distance away. He reentered the compound on foot, waited there, and received a phone call. Around 7:30, when dark was beginning to fall, he got back in the truck and drove off. This after-search span of time does not affect the validity of what had been done at approximately 2:45 to 3:00 p. m. pursuant to the exigencies then existent.[2] Nor does the fact that approximately an hour elapsed before the officers became aware of the exigency of possible immediate departure invalidate the action which they took when they did become aware.

When the rig departed agents tailed it in two cars. Shortly before that time they had been notified by the informant that the rig would be met by a pickup truck which would precede it to a location in South San Antonio where the marijuana was to be unloaded. The information turned out to be correct. The rig, driven by Compean, met a pickup truck. A man variously identified as David Maspero or as Frank Ruiz exited the pickup and entered the tractor, and the two units proceeded with the pickup in front. The pickup turned off the road and entered the parking area of a mission. It executed a turn, and its

2. We need not consider whether the owner of the refrigeration company could consent to the search, and we assume that all appellants had standing to question the validity of the search.

lights swept the street which it had just departed and were then turned off. The tractor-trailer rig continued, and the pickup pulled back to the street and fell into line behind the tailing cars. The rig turned into the driveway of the residence of David Maspero, located on a dirt road in a semi-urban area on the outskirts of the city. The pickup went past the residence, made a U-turn and then headed back in the direction from which it had come. Before it again reached the Maspero home agents stopped it and arrested the two occupants, Roger Pacheco and Raul Vasquez-Villalobos. One of the tailing units drove on to the Maspero driveway where the agents observed three persons in the vicinity of the stopped rig—David Maspero, Frank Ruiz and Roberto Vasquez-Villalobos. The agents approached, calling out that they were federal officers. Maspero ran toward the rear of the house, encountered a fence, stopped, and then surrendered. Ruiz reached for his waistband, an agent fired a warning shot, and Ruiz then raised his hands. Subsequently it was found that he was armed. Roberto Vasquez-Villalobos surrendered without opposition. Compean had remained in the cab of the tractor. These events occurred around 7:30, at which time it was entirely dark.

Around 8:00 p. m. agents entered the trailer, seized the marijuana seeds previously observed, and seized the rig as well. One wheel of the tractor had crushed in the septic tank system of the Maspero home, but the trailer was extricated and an agent drove the rig to the San Antonio office of the BNDD, arriving between 9:30 and 9:45. There a thorough search was made, and the informant's tip about a hidden compartment under the floor of the trailer proved correct. Unable to open the compartment by removing the bolts in the floor, agents forced it open with a crowbar. There they discovered 2,900 pounds of marijuana in brick form.

■ The seizure of the marijuana at the Maspero home and the seizure of the trailer and its subsequent search at the BNDD office were valid. The agents were armed not merely with probable cause but with certainty, based on the earlier search at the refrigeration company, that the truck was carrying contraband. See Cooper v. California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967); Chambers v. Maroney, *supra*, 399 U.S. at 52 & n. 10, 90 S.Ct. at 1981, 26 L.Ed.2d at 428–429; Carlton v. Estelle, 480 F.2d 759 (CA5, 1973); Note, Warrantless Searches and Seizures of Automobiles, 87 Harv.L.Rev. at 844–845.

## II. Sufficiency of the evidence.

Motions for judgment of acquittal were properly made and were denied.

The following is the pertinent testimony of Compean. On instructions from his employer, Raul Vasquez-Villalobos, he brought the rig from Mexico to the refrigeration company in San Antonio for repairs on the refrigeration unit. The tractor belonged to Raul and bore his initials on the side. While at the refrigeration company Compean received two phone calls from Raul with instructions to bring back from San Antonio some automobile motors and instructing him when and where to meet a pickup truck which would lead him to where the motors were located. The rendezvous took place as Compean had been told. A person got out of the pickup truck and got in the tractor with him and gave him directions. Compean made an uncertain identification of this person as Ruiz. Observing agents identified the person who entered as Maspero and also testified that Maspero alighted from the tractor at the residence. As the truck pulled in to the Maspero drive Roberto Vasquez-Villalobos directed Compean where to park.

Maspero testified as follows. He was at home during the entire day, suffering from a back injury which had laid him up for 10 or 15 days. The two junked automobiles and one auto motor located on his premises had been placed there with his permission by Ruiz two or three months earlier, and Ruiz had paid him for allowing them to be kept there.

He had known Ruiz two or three years. During the afternoon Ruiz and two other men (who were not introduced to Maspero but later became known to him as the Vasquez-Villalobos brothers) had come to the Maspero home in Ruiz's car, looked at the wrecked autos, and departed, saying they would return "directly." They did return, this time in a pickup truck driven by Pacheco. Ruiz said that he had had car trouble and had flagged down Pacheco, who had given him and the two brothers a ride to the Maspero home. Ruiz stated that he was going to get Pacheco to give him another ride from the Maspero home to get a truck to move the wrecked cars. Not all the men could fit into the pickup, so Ruiz, Pacheco and Raul departed, leaving Roberto behind in Maspero's front yard. Thereafter the tractor-trailer rig came and pulled into the yard, followed almost immediately by shouting federal officers. Maspero denied having left the premises and denied being the person who exited the pickup and entered the tractor at the rendezvous.

Ruiz testified consistently with Maspero, confirming that he was acquainted with Maspero and had placed the cars and motor at Maspero's home and had paid him a few dollars for the privilege of putting them there. He stated that during the afternoon in question he had by chance encountered in San Antonio the Vasquez-Villalobos brothers, previously unknown to him, when they asked him for directions about the location of a street. In the ensuing conversation Ruiz brought up the wrecked cars and motor and was able to interest the men in purchasing them, whereupon the three drove to the Maspero home, examined the items and agreed on the terms of a purchase ($45 for one car, $25 for the other, $17 for the motor).

Pacheco's version was that while en route to Maspero's home to check on game roosters he was flagged down by Ruiz whose car was disabled, and he gave Ruiz and the two men with him a ride to Maspero's. The men with Ruiz looked at the wrecked cars, and Ruiz asked him to give them a ride to meet a truck that was to come after the cars and motor. He explained his conduct at the mission on the ground his lights failed and he had to leave the road and get his lights back in operation and stay out of the way of the rig, after which he fell in line behind a tailing car, thinking it was the car of a friend.

The evidence was sufficient under the conspiracy count. As to Ruiz: he had met with the Vasquez-Villalobos brothers and twice accompanied them or brought them to Maspero's home; the jury could conclude that he was present when the tractor-trailer rig arrived; he was armed; he arranged for Pacheco to go in the pickup truck to the rendezvous. The jury could, and obviously did, reject the story concerning purchase of the two cars and the motor. There was no lift or other gear by means of which they could be maneuvered into the trailer. The foreman of the refrigeration company testified that transporting the autos and motor in the insulated trailer would punch holes in its walls and damage its insulating qualities. Finally, the story of a chance meeting with a Mexican millionaire resulting in a tractor-trailer unit and driver being held up for several hours (until dark) to pick up junked cars worth less than $100 is, to say the least, not very persuasive. And, finally, when arrested Ruiz gave a false statement to officers, the untruth of which he acknowledged at trial.

As to Maspero: the theory of insufficient evidence rests in large part on his claim that he did not flee when the officers approached and was not the person who entered the tractor and guided Compean to the residence. These were jury issues.

Pacheco's nexus is more tenuous. But his activities which we have described, plus the fact that he made an admittedly false statement when arrested, were enough.

■ On the possession count, the evidence was sufficient as to Pacheco

and Maspero.[3] Possession can be constructive as well as actual. The hallmark of constructive possession is some measure of dominion and control over the contraband. Dominion and control can be either exclusive or shared. See United States v. Virciglio, 441 F.2d 1295 (CA5, 1971); Jasso v. United States, 290 F.2d 671 (CA5, 1961).

The jury was entitled to place Maspero in the cab of the tractor-trailer and to infer that he had enough control over its progression and destination to constitute constructive possession. By the same token, Pacheco, as driver of the pickup truck, inferably acted as a guide directing the rig to its intended destination and thus shared dominion and control over the marijuana shipment, making him a constructive possessor.

We reach a different conclusion with respect to Ruiz. He was present in the driveway of the Maspero home when the tractor-trailer pulled in. But mere presence in the area of contraband or awareness of its location is not sufficient to establish possession. See United States v. Stephenson, 474 F.2d 1353 (CA5, 1973). Clearly Ruiz was not in actual possession and there was no evidence that he possessed such shared or exclusive dominion and control over it as to constitute constructive possession.[4] There is no contention and no evidence that those who did possess the marijuana acted as agents of Ruiz as in United States v. Hernandez, 441 F.2d 157 (CA5, 1971). Finally, although Ruiz was indicted under 18 U.S.C. § 2 for aiding and abetting the 21 U.S.C. § 841 offense, the jury was not instructed on aiding and abetting and thus his conviction cannot be sustained upon that theo-ry. We conclude that his motion for judgment of acquittal on the possession count should have been granted.

Affirmed as to appellants Maspero and Pacheco. With respect to appellant Ruiz, the conviction under Count One is affirmed and the conviction under Count Four is reversed.

3. Since appellants received consecutive sentences for conspiracy and for the substantive offense of possession with intent to sell, the concurrent sentence doctrine does not relieve us of the duty to consider the sufficiency of the evidence supporting the possession conviction.

4. Assuming but not deciding that Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), remains viable and would otherwise be applicable in this case, Ruiz's possession conviction cannot be sustained upon a *Pinkerton* theory, as the jury was not charged on that theory. See United States v. Apollo, 5 Cir., 476 F.2d 156, 162 n. 5. On the question of *Pinkerton's* applicability cf. Fitzpatrick v. United States, 410 F.2d 513, 517 (CA5, 1969); Smith v. United States, 385 F.2d 34, 39 & n. 17 (CA5, 1967); Hernandez v. United States, 300 F.2d 114 (CA9, 1962).