UNITED STATES of America,
Plaintiff-Appellee,

v.

Fulgencio PANTOJA–SOTO, Raul Pal-Sali, Nelio A. Nunez and Manuel Roberto Guerrero, Defendants-Appellants.

No. 82–5454.

United States Court of Appeals,
Eleventh Circuit.

Aug. 27, 1984.

Gelber, Glass & Canal, P.A., Roy T. Gelber, N. Joseph Durant, Miami, Fla., for Pal-Sali, Nunez and Guerrero.

Theodore J. Sakowitz, Federal Public Defender, Robyn J. Hermann, Charles Auslander, Asst. Federal Public Defenders, Miami, Fla., for Patoja-Soto.

Stanley Marcus, U.S. Atty., Neil Taylor, Sonia Escobio O'Donnell, Linda Collins-Hertz, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before TJOFLAT and CLARK, Circuit Judges, and GOLDBERG *, Senior Circuit Judge.

GOLDBERG, Senior Circuit Judge:

Appellants Fulgencio Pantoja-Soto, Raul Pal-Sali, Nelio Nunez and Manuel Guerrero appeal their convictions on two counts of federal drug law violations. We find no reversible error in the conviction of Pantoja-Soto and therefore affirm the jury's verdict as to him. With respect to Pal-Sali,

---

* Honorable Irving L. Goldberg, U.S. Circuit Judge for the Fifth Circuit, sitting by designa- tion.

Nunez and Guerrero, however, we find that their convictions are not supported by sufficient evidence and reverse.

## FACTS

On April 6, 1981, Special Agent Pedro Velazco of the Drug Enforcement Administration (DEA) received information via a confidential informant (the "CI") that a particular person in the Miami Beach area had a large amount of methaqualone tablets for sale. At around 11:30 a.m. of the following day, Agent Velazco and the CI met with Pantoja at the latter's apartment. A sale of approximately 50,000 methaqualone tablets was negotiated at that meeting. Pantoja said that he could obtain the tablets for seventy-five cents each, for a total of $37,000, and that it would take thirty minutes to arrange. Agent Velazco and the CI were to leave the apartment, and Agent Velazco was to phone Pantoja in thirty minutes. When he called, Agent Velazco was told that the pills were on the way but that they had not yet arrived. Velazco called several more times throughout the afternoon; each call produced the same answer—the drugs had not arrived. At approximately 7:30 that evening, Agent Velazco dropped the CI at Pantoja's apartment to find out the problem. Velazco then parked his car at a location several blocks from appellant's apartment. About forty minutes later, the CI and another individual, Angel Diaz, arrived in a maroon automobile at Velazco's location. Diaz indicated that he was the owner of the 50,000 methaqualone tablets and that the only problem in making the deal was that the CI owed him money. Velazco assured Diaz that if Diaz would deliver the pills he, Velazco, would make sure Diaz was paid what he was owed. Diaz agreed to the sale; he then left with the CI in the maroon car. A short while later, other surveillance agents notified Velazco that the maroon vehicle, with five individuals inside, was returning to Velazco's location. Velazco then left the location. He called Pantoja's apartment at around 8:45 p.m., explaining

that he had left the spot because he had observed a car full of people heading his way and he did not want the $37,000 "ripped off." Diaz assured Velazco that no "rip off" had been intended. According to Diaz, only Pantoja, Pantoja's girlfriend, Diaz, Diaz's girlfriend, and the CI had been in the car. Diaz said the deal was still on, but, the location was to be changed. The deal was now to take place at a gas station in a section of Miami known as "Little Havana."

Agent Velazco and the CI proceeded to the vicinity of the gas station. Velazco searched the CI and then, around 9:30 p.m., dropped the CI near the station. Diaz and several others arrived in the maroon automobile, picked up the CI, and drove him to the gas station. Shortly thereafter, the CI returned to Agent Velazco and handed him three tablets. Agent Velazco "field tested" the tablets and determined them to be of "bootleg" rather than pharmaceutical quality. Velazco then made arrangements with other DEA agents and the local police to raid the gas station. At 9:55 p.m., Agent Velazco, with a pistol in each hand, led a charge of 14 law enforcement officers, all with weapons drawn, into the gas station.

The station, located on a corner lot, has gas pumps fronting on both streets, an office, and three service bays. At the time of the raid the station was not open for business, and the lamps in the pump areas were not illuminated. A door connects the office to two of the service bays. On the night of the raid, the overhead doors on those two service bays were closed and locked. The only other door to the office, the door leading outside, was open, and the office lights were illuminated.

When the agents approached the station, Diaz and appellants Pantoja and Guerrero were kneeling together outside the station building. Next to them was an automobile with its hood up. Behind that vehicle was another automobile with two unidentified persons standing beside it.[1] Both vehicles

---

1. Agent Velazco testified that he determined that these two unidentified individuals and three others who were on the station lot at the time of the raid were not involved in the drug deal. The five were briefly detained, but they were not arrested. Record, Vol. II at 76–77.

were "some distance" away from the office and service bays. ·Record, Vol. II at 76. DEA Agent Snyder immediately arrested Diaz, Pantoja, and Guerrero. Appellants Pal-Sali and Nunez were standing in the office of the station. As Agent Velazco approached, Pal-Sali ran out the office's front door and was arrested by Velazco. Nunez ran out the office's side door into the service bay area.[2] Two police officers and Velazco then entered the building and began looking for Nunez. About ten minutes later, the officers located Nunez, hiding behind a rack of tires in a storeroom. During the search for Nunez, Agent Velazco discovered four large boxes on the floor of one of the service bays. Two of the boxes were open; the methaqualone tablets were plainly visible.

## PROCEEDINGS BELOW

Pantoja-Soto, Pal-Sali, Nunez and Guerrero were all charged in the same two-count indictment. Count I alleges that appellants knowingly and intentionally possessed, with intent to distribute, a quantity of methaqualone tablets.[3] Count II charges that appellants knowingly and wilfully conspired to possess, with intent to distribute, methaqualone.[4] Upon motion by appellants Pal-Sali, Nunez and Guerrero, the district court severed their trial from Pantoja's. All four appellants moved to suppress evidence seized at the time of their arrests. That motion was denied after a hearing before a magistrate. A jury convicted Pal-Sali, Nunez and Guerrero on both counts, and the three appellants' subsequent motion for a judgment of acquittal was denied. Appellant Pantoja-Soto was convicted by a jury in a separate trial. All appellants received prison terms.

**2.** The record indicates that all of the appellants claimed to have been employees of the station. At trial, however, Agent Velazco testified that he never investigated these claims. Record, Vol. II at 78.

**3.** In violation of 21 U.S.C. § 841(a)(1); 18 U.S.C. § 2.

**4.** In violation of 21 U.S.C. § 841(a)(1); 21 U.S.C. § 846.

*The Fourth Amendment Claim*

Appellant Pantoja claims that the court below erred in failing to suppress evidence that was seized when law enforcement officers entered the service bay area of the service station.[5] He contends that officers violated the Fourth Amendment by not obtaining a search warrant before entering the service station.[6] In reviewing this claim, we initially note that Fourth Amendment protection extends to business premises. *G.M. Leasing Corp. v. United States,* 429 U.S. 338, 354, 97 S.Ct. 619, 629, 50 L.Ed.2d 530 (1977). Such protection contemplates that a neutral and detached magistrate issue a warrant, supported by probable cause, before law enforcement officers may enter the premises. Only in the face of "exigent circumstances," where obtaining a warrant would greatly compromise important law enforcement objectives, does the warrant requirement yield. When exigent circumstances coexist with probable cause, the Fourth Amendment has been held to permit warrantless searches and seizures. *See generally United States v. Blasco,* 702 F.2d 1315, 1324 (11th Cir.), *cert denied sub nom.; Jamardo v. United States,* — U.S. —, 104 S.Ct. 276, 78 L.Ed.2d 256 (1983), and *Galvan v. United States,* — U.S. —, 104 S.Ct. 275, 78 L.Ed.2d 256 (1983).

Probable cause to arrest exists "where the facts and circumstances within the collective knowledge of the law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed." Id. *United States v.*

**5.** Appellants Nunez, Guerrero and Pal-Sali do not appeal the trial court's refusal to suppress the methaqualone.

**6.** The facts in this record suggest a serious question whether Pantoja had a legitimate expectation of privacy in the station's interior. *See Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Because this question was neither raised below nor briefed on appeal, and because appellant's Fourth Amendment claim fails on other grounds, we do not reach the *Rakas* issue.

*Perez*, 526 F.2d 859 (5th Cir.), *cert. denied*, 429 U.S. 846, 97 S.Ct. 129, 50 L.Ed.2d 118 (1976).[7] In this case, law enforcement officials had probable cause prior to the raid to believe that certain individuals at the service station were involved in the distribution of methaqualone. The CI, after leaving with Diaz and Pantoja, had returned from the service station with three tablets. At that point, circumstances strongly indicated that at least Diaz and Pantoja were holding drugs at the station to sell. While executing the raid and arresting Diaz and Pantoja, officers observed Nunez and Pal-Sali standing inside the service station office. As Agent Velazco approached, Nunez fled from the office through a side door into the service bay. At that point, given Nunez's presence at the station and his flight, officers had probable cause to believe that he was in some way involved in the drug transaction. Moreover, any delay in apprehending the suspect conceivably could have increased the danger to officers on the station premises and allowed destruction of evidence. Exigent circumstances justified the officer's warrantless entry of the station building to pursue Nunez. *See United States v. Santana*, 427 U.S. 38, 44, 96 S.Ct. 2406, 2410, 49 L.Ed.2d 300 (1976) (pursuit of fleeing suspect); *Blasco*, 702 F.2d at 1326 (danger to officers justified warrantless, exploratory search of a residence). Once inside the station building, the officers could then lawfully seize the methaqualone tablets which lay in the officer's "plain view." *See Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983); *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

The facts of this case also lead us to conclude that the officers involved in the raid did not illegitimately manufacture exigent circumstances. Agent Velazco did not know until around 8:45 p.m. the night of the raid, little more than an hour before the appellants' arrest, that the transaction was to take place at the gas station. Moreover, there is no evidence to indicate that Velazco knew, at any time prior to the CI's return with the three tablets, that the methqualone would be in an enclosed area of the service station building. The drugs could well have been in the maroon car or somewhere on the station lot. After the CI returned from the station, the situation required immediate action by the law enforcement officers. Delay in consummating the deal could have aroused the suspicion of Diaz and Pantoja. The suspects and the evidence would be lost. Finally, the particular circumstance that necessitated the officers' warrantless entry—i.e., Nunez's flight into the station—is not one that could easily have been anticipated by officers.

 Had officials known that the drugs were inside the station and had the legality of their warrantless entry depended on a more predictable circumstance, this case would have presented a different question. However, under the facts here we cannot fault the officers for their failure to obtain a search warrant. No Fourth Amendment violation occurred.[8]

## Sufficiency of the Evidence

Appellants Pal-Sali, Nunez and Guerrero challenge their convictions on the basis that the evidence at trial failed to establish either their possession of the methaqualone or their participation in the charged conspiracy. In passing on these claims of insufficiency of evidence, we must view the facts in the light most favorable to the government. *Blasco, supra*, 702 at 1331. Considering the facts in their totality, *United States v. DeSimone*, 660 F.2d 532, 539 (5th Cir.1981) (Unit B), *cert. denied sub*

---

7. "Probable cause" defines a radically different standard than "beyond a reasonable doubt." *See infra* at p. 16. An arrest must stand upon more than suspicion, but "the arresting officer need not have in hand evidence sufficient to convict." *United States v. Rieves*, 584 F.2d 740, 745 (5th Cir.1978).

8. Pantoja-Soto also raises a claim of prosecutor misconduct, citing certain references to appellant's wife during the testimony of Agent Velazco and during the government's closing argument. Due to the strength of the evidence against Pantoja and the very slight level of possible prejudice, any error was harmless.

*nom., Butler v. United States,* 455 U.S. 1027, 102 S.Ct. 1732, 72 L.Ed.2d 149 (1982), and *Broderick v. United States,* 456 U.S. 928, 102 S.Ct. 1976, 72 L.Ed.2d 444 (1982), all reasonable inferences and credibility choices must then be made in favor of the jury verdict. *Ibid.* However, if it is nevertheless the case that a reasonable trier of fact could not find that the evidence establishes guilt beyond a reasonable doubt, we are duty bound to reverse the jury's verdict. *See id.; United States v. Bell,* 678 F.2d 547 (5th Cir.1982) (Unit B) (en banc), *aff'd on other grounds,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

■ To prove the offense of conspiracy, the government must demonstrate that an agreement existed between two or more people to commit a crime, that the accused had knowledge of at least the essential objectives of that agreement, and that armed with that knowledge, he voluntarily joined or participated in the illegal venture. *Blasco, supra,* 702 F.2d at 1330; *United States v. Vera,* 701 F.2d 1349, 1357 (11th Cir.1983). Even if a defendant did not join the conspiracy until after its inception, and even if he played only a minor role in the whole scheme, he may still be convicted. *United States v. Tamargo,* 672 F.2d 887, 889 (11th Cir.1982). Inferences from the conduct of the alleged participants or from other circumstantial evidence of a scheme may provide the basis for establishing that a conspiratorial agreement existed. *Blasco, supra,* 702 F.2d at 1330; *United States v. Spradlen,* 662 F.2d 724, 727 (11th Cir. 1981).

■ Likewise, possession of a controlled substance with intent to distribute may be proved by circumstantial as well as direct evidence. *United States v. Bustos-Guzman,* 685 F.2d 1278, 1280 (11th Cir. 1982). Intent to distribute may be inferred from the amount of contraband. *Tamargo, supra,* 672 F.2d at 890. Possession may be either actual or constructive; if the accused exercised "some measure of dominion or control over the contraband," either exclusively or in association with others, he constructively possessed it. *Blasco supra,* 702 F.2d at 1330; *United States v. Maspero,* 496 F.2d 1354, 1359 (5th

Cir.1974). In this case, the indictment and jury charge also allowed the jury to find guilt on the possession charge if it found that the appellants aided and abetted possession by others. Record, Vol. II at 150. To sustain a conviction under an aiding and abetting theory, the prosecution must show that "the defendant associated himself with a criminal venture, participated in it as something he wished to bring about, and sought by his actions to make it succeed." *United States v. Bryant,* 671 F.2d 450, 454 (11th Cir.1982); *United States v. Schwartz,* 666 F.2d 461, 463 (11th Cir.1982). In proving that a defendant aided and abetted possession of a controlled substance with intent to distribute, the government "must introduce evidence connecting defendant with both aspects of the crime, possession and intent to distribute." *Schwartz, supra,* 666 F.2d at 463. And again, the essential elements of aiding and abetting may be proved by direct or circumstantial evidence. *United States v. Smith,* 700 F.2d 627 (11th Cir.1983).

■ The evidence against Pal-Sali, Nunez and Guerrero on both the substantive possession charge and the conspiracy charge is extremely thin. Specifically, the government never established that any of the three had ever known or even encountered Pantoja or Diaz before the night of the raid. Although Guerrero was observed talking with Pantoja and Diaz on the night of the raid, there is no evidence regarding how long Guerrero had known the two. Pal-Sali and Nunez, standing inside the office, were nowhere near Pantoja and Diaz when officers arrived. At trial, Agent Velazco specifically testified that during negotiations of the deal with Pantoja, not one of the other three appellants' names was ever mentioned. Velazco had never even heard of appellants before their arrest. Record, Vol. II at 78, 83. While guilt by association or sanguinity may not attach, *Blasco, supra,* 702 F.2d at 1330, *United States v. Jackson,* 588 F.2d 1046, 1056 (5th Cir.), *cert. denied,* 442 U.S. 941, 99 S.Ct. 2882, 61 L.Ed.2d 310 (1979), evidence of a preexisting relationship among the accused may be considered as a factor. *United States v.*

*Cole,* 704 F.2d 554, 557 (11th Cir.1983); *United States v. MacPherson,* 664 F.2d 69, 74 (5th Cir.1981) (Unit B). That factor is notably absent in the instant case.

There is also no evidence showing that any of the three appellants had ever handled the drugs or that they even knew of the drug's presence in the service bay. The government presented no fingerprint evidence from the boxes of methaqualone. No testimony placed any of the appellants in the service bay prior to the raid. While knowledge that a criminal undertaking was occurring would not be sufficient to sustain the convictions, such evidence would be probative. *See United States v. Smith,* 546 F.2d 1275, 1284 (5th Cir.1977). Again, though, that evidence is not to be found in this case.

What the government did establish is that each of the appellants was on the service station premises after closing with the pump area lights not illuminated. That the station was not open for business and that the pump area lights were extinguished, even in the context of the other established facts, hardly link appellants to the drug transaction. As noted above, the government presented no evidence that the three were not employees of the station. And, even if they were not employees, their presence at the station after operating hours does not by itself indicate that they were present to play some part in a drug sale. It is a matter beyond controversy that mere physical presence at the scene of a crime cannot support a conviction. *United States v. Miller,* 693 F.2d 1051, 1053 (11th Cir.1982); *MacPherson, supra,* 664 F.2d at 74; *United States v. Ferg,* 504 F.2d 914, 916 (5th Cir.1974); *United States v. Stephenson,* 474 F.2d 1353, 1355 (5th Cir. 1973). Conspiracy implies much more than physical proximity to purported coconspirators; possession entails more than physical proximity to the controlled substance.

· With regard to three appellants in this case, the government has demonstrated very little besides their presence at the gas station. In Guerrero's case, the government makes much of the fact that his father owned the gas station. Although that fact makes it somewhat more likely that Guerrero knew that the station was being used for the drug transaction, the evidence is not significant in view of other facts in the case. In short, too many assumptions stand between his father's ownership of the station and the conclusion that Guerrero knew about or aided the deal.[9] The record suggests that others on the premises that night claimed to be employees of the station. There is no evidence to indicate that Guerrero, rather than some other employee, authorized the station to be used for a drug deal. More importantly, there is nothing to show that any authorization was actually given. That his father owned the station could even be seen as exculpatory with regard to Guerrero; he more likely had a legitimate reason for being present after the station's closing time. Guerrero's conviction, based only on his presence at the station and his father's ownership of the station, is entirely at odds with the "reasonable doubt" standard.

The evidence against Pal-Sali and Nunez, while clearly insufficient, is somewhat stronger than that against Guerrero. Pal-Sali and Nunez were closer than Guerrero to the drugs when the raid occurred. They were in the office adjacent to the service bay in which the boxes of methaqualone were found. This, however, does not demonstrate that Nunez or Pal-Sali knew that there were drugs at the station. The service bay is a separate room, connected to the office by a door. In addition to being present at the station, however, Pal-Sali and Nunez attempted to flee when they were approached by armed officers. Still, these two factors, presence at the scene of the crime and flight, without more, are insufficient to prove commission of a crime. *United States v. Lopez-Llerena,* 721 F.2d 311, 312 (11th Cir.1983); *DeSimone, supra,* 660 F.2d at 537; *United States v. Flores,* 564 F.2d 717, 718–19 (5th Cir.1977). In *United States v. Pintado,* 715 F.2d 1501 (11th Cir.1983), the Court reviewed a con-

---

**9.** *Cf. United States v. Barrera,* 547 F.2d 1250, 1256 (5th Cir.1977) (mere ownership of a vehi-cle containing contraband is insufficient to constitute constructive possession).

viction for possession of marijuana. The defendant was present in a house where a marijuana delivery occurred, and the police found him hiding in a closet. Reversing the defendant's conviction, the Court relied on the *DeSimone* holding that presence followed by flight is inadequate to prove a specific crime. Recognizing that subsequent to *DeSimone* the Circuit had adopted a new standard for sufficiency of evidence review,[10] the *Pintado* Court nonetheless held that *DeSimone* continued as good law. 715 F.2d at 1504.

Absent "objective facts or circumstances from which appellant's knowledge of the ongoing operation could be inferred," presence plus flight remains inadequate to uphold a conviction. *Id.* at 1505. No such objective facts or circumstances exist in the instant case. There is no evidence that the three appellants saw the boxes being placed in the service bay or that they had been inside the bay prior to the raid.[11] No one testified as to any telltale odors, noises, or sights at the station from which a jury could have inferred that appellants knew of the drug's presence. *Compare Blasco, supra,* 715 F.2d at 1332 (marijuana offloading operation created noise that could be heard in the house where defendants were arrested, and a pungent odor of marijuana pervaded the air in and around the house).

10. *Bell, supra,* 678 F.2d at 549.

11. Supra at 11–12.

12. Justice Stewart in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) observed

> reasonable doubt is not confined to those defendants who are morally blameless. Under our system of criminal justice even a thief is entitled to complain that he has been unconstitutionally convicted and imprisoned as a burglar. [citation omitted].

But it is not only the rights of that individual thief that are at stake when courts review a claim of insufficient evidence. The "beyond a reasonable doubt standard" goes to the pragmatic, as well as the idealogical core of our criminal justice system. The evidentiary standard, under which evidence against an accused is weighed, bears most directly on whether that individual will suffer a government imposed penalty. It is so both for defendants who chose to go to trial and those who do not. For the large percentage of federal criminal defendants that plead guilty, see M. Finkelstein, "A Statisti-

Consistent with prior precedent, we find that the presence of Pal-Sali and Nunez at the site of the raid coupled with their flight from officers is insufficient to support their convictions.[12]

The doctrine that evidence must be sufficient to prove that a defendant is guilty beyond a reasonable doubt has in recent years become somewhat more elastic. Indeed, in deciding claims of insufficient evidence, courts no longer must assure themselves that the evidence excludes every reasonable hypothesis of innocence. *Bell, supra,* 678 F.2d at 549. That does not mean, however, that juries can convict on the basis of mere suspicion, on the barest of circumstantial evidence that can be squared with endless hypotheses of innocence. The doctrine of proof beyond a reasonable doubt, though of ancient vintage, has not yet been discarded. The government must still be put to its constitutionally mandated task.

The conviction of appellant Pantoja-Soto is AFFIRMED. The convictions of appellants Nunez, Pal-Sali and Guerrero are REVERSED.

TJOFLAT, Circuit Judge, dissenting:

I am compelled to dissent because I am convinced that the majority have directed

cal Analysis of Guilty Plea Practices in the Federal Courts," 89 Harv.L.Rev. 293, 314 (1975), the right not to be convicted except on evidence that proves guilt beyond a reasonable doubt provides very real protections. Those who plead guilty forego the procedural safeguards that inhere in the trial process; they eschew protections guaranteed by the constitution. *See Boykin v. Alabama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). Most important in a pragmatic sense, however, is that they give up any chance that a jury might acquit them and free them from any criminal penalty. In many instances defendants make the choice to plead guilty after balancing the chance that a jury will acquit them against the reduction or possible reduction in penalty that a negotiated guilty plea brings. To allow juries to convict when their level of certitude is low distorts the existing balance and gives the government more leverage in bargaining. It deprives those who plead guilty of the basic protection provided by the "beyond a reasonable doubt" standard.

the acquittal of three drug traffickers who, I submit, are obviously guilty.

Our standard of review is time-honored, yet worthy of repeating. We must view the evidence in a criminal case in the light most favorable to the government, with all reasonable inferences from the evidence drawn in favor of the jury's verdict. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *U.S. v. Thomas*, 676 F.2d 531, 535 (11th Cir.1982). Their verdict must be sustained if any reasonable construction of the evidence allowed them to find guilt beyond a reasonable doubt. *United States v. Bell*, 678 F.2d 547, 549 (5th Cir.1982) (Unit B), *aff'd* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).[1] With this firmly in mind, I suggest that the jurors were authorized to find the following facts.

First, Diaz, the owner of the drugs, suggested the meeting at the Texaco station. He was sufficiently acquainted with the station's owner that he felt comfortable using the station as a site to traffic drugs. Common sense suggests that the gas station was well suited for drug trafficking, especially at night time, because the buyer's vehicle could be concealed in the service bay during the narcotics transfer, thus avoiding suspicion.

Second, at 9:30 p.m. Diaz and Pantoja-Soto took the confidential informant to the Texaco station to get a sample of the methaqualone tablets. Diaz and Pantoja-Soto would not have left $35,000 worth of drugs unattended. All 50,000 tablets were in the garage bay, and they had to have some trusted confederates to guard them.

The appearance of the Texaco station at the time of the police raid is a third important relevant consideration. It was a large service station on a corner lot in a high crime area of Miami. The station closed for business at 5:30 p.m. Only the office light was on when police arrived. The owner's son, Guerrero, was kneeling with Diaz and Pantoja-Soto, who owned the drugs, by a car in the driveway. Guerre-

ro's decision not to turn on the outside lights suggested something sinister. His explanation, that he was concerned about the station's high crime location, was rejected by the jury. We have held that such implausible explanations may give rise to positive evidence of guilt. *United States v. Eley*, 723 F.2d 1522, 1525 (11th Cir.1984).

Fourth, the four boxes of methaqualone tablets were on the floor of the garage service bay. Two of the boxes were open with the drugs in plain view. The outside doors were locked so that the bay could only be reached through the office. Nunez and Pal-Sali were in the office. The jury was entitled to infer that they were stationed there to guard the drugs while Diaz and Pantoja were away. They certainly would not have been given access to the 50,000 capsules, which were in plain view, unless they were part of the gang.

Fifth, this all occurred at night in a high crime neighborhood while the station was closed. Guerrero, if he was not a member of the gang, would have investigated the situation, with haste. There were unauthorized persons on the property and the office was unlocked with the light turned on. But he did not investigate. He had no reason to; he was a member of the gang and knew what was going on. The jury drew the only common sense inference permissible from the hard evidence; everyone knew each other and why they were at the station that night. Drug traffickers like these do not conduct a $35,000 narcotics transaction with strangers around.

Finally, Nunez and Pal-Sali ran from the police. The law enforcement officers announced that they were the police immediately upon their arrival. Several marked Miami police cruisers were involved in the raid. The Miami police officers were in uniform, some carrying shotguns. In fact, the drug enforcement agents specifically requested the Miami police to ensure their immediate recognition as police officers, thereby preventing the appellants' claim of

---

**1.** In *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir.1982), this court adopted as binding precedent all decisions of Unit B of the former

Fifth Circuit handed down after September 30, 1981.

mistaken identity. Flight from police under these circumstances supports a strong inference of guilt; the majority apparently do not agree.

In sum, the jurors had plenty of evidence on which to convict Pal-Sali, Nunez and Guerrero. Their convictions should be affirmed.