UNITED STATES of America,
Plaintiff–Appellee,

v.

Antoinette M. FRINK and James Lon Callier, Defendants–Appellants.

No. 89–8545.

United States Court of Appeals,
Eleventh Circuit.

Sept. 26, 1990.

**1414**

Andrew J. Ekonomou, Atlanta, Ga., for Frink.

H.B. Edwards, Valdosta, Ca., for Callier.

Joe D. Whitley, U.S. Atty., Deborah A. Griffin, Charles L. Calhoun, Asst. U.S. Atty., Macon, Ga., for plaintiff-appellee.

Before HATCHETT, Circuit Judge, HILL* and FAIRCHILD**, Senior Circuit Judges.

HATCHETT, Circuit Judge.

In this drug conspiracy case, we affirm the convictions because sufficient evidence demonstrates the appellants' willful participation in the conspiracy.

### FACTS

The investigation resulting in the indictment in this case began on October 27, 1987, when a Georgia state patrolman stopped Susie Ruales and Antonio Delgado for speeding. After receiving consent to search, the patrolman found sixty-one kilograms of cocaine beneath the truck's bed. The truck was registered to National Carpets, Inc. in Ohio. National Carpets, however, was not a real business; it existed only on paper as a cover for an illegal drug organization. Trevor Whittaker, the purported owner of National Carpets, hired Ruales and Delgado to deliver the cocaine in Detroit, Michigan.

Whittaker and his partner, Tyrone Walker, operated a large-scale cocaine network using automobiles to transport cocaine from Florida to Detroit, Michigan. Walker originated the conspiracy and dealt directly with the distributors of the cocaine. Walker decided that vehicles with Florida license plates were more likely to be stopped and searched as they traveled up I–75 to Detroit. Therefore, he contacted Callier, an automobile salesman who could purchase vehicles outside the state of Florida.

Callier purchased at least eleven vehicles with cash from Antoinette Frink, president of McFrink Chevrolet/Cadillac, Inc. in Delaware, Ohio. The vehicles were purchased through "house deals" in which the management of the dealership makes the sale instead of a salesman, eliminating the

---

* *See* Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

** Honorable Thomas E. Fairchild, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

salesman's commission and reducing the purchase price. Several times Callier bought vehicles located in Florida through McFrink Chevrolet, even though the vehicles never actually passed through the Ohio dealership. In these cases, McFrink Chevrolet served merely to "flip" titles on the vehicles, a process of changing the registration from Florida to Ohio. Vehicles with flipped titles could display Ohio license plates which would raise less suspicion on trips from Miami to Detroit. Frink filed paperwork on these vehicles using false names and addresses and certifying odometer readings on vehicles which she had never seen. Because a cash deposit to the bank in excess of $10,000 would necessitate the filing of a currency transaction report ("CTR"), Callier always split up the cash payments over two or three days.[1]

In Callier's first purchase from Frink, Walker gave Whittaker $60,000 to buy a Winnebago, and Whittaker transferred the cash to Callier in Miami. Callier flew to Ohio to negotiate the purchase even though the Winnebago was at all times in Miami. Callier signed the odometer statement as president of Ultra Carpets, listing its address as 5155 North High Street, Columbus, Ohio. Callier, however, was not the president of Ultra Carpets, and the address did not exist. Within a few weeks of its purchase, Customs agents seized the Winnebago from a "chop shop" in Miami where it was being fitted with a water tank. Callier had delivered the Winnebago to the "chop shop," and he called Customs to inquire about its seizure.

Callier had also purchased the Silverado truck driven by Ruales and Delgado from Frink. On one trip to Ohio, Ivan McCaskill accompanied Callier and purchased a Plymouth Reliant for the conspiracy. During the transaction, McCaskill offered Frink a trip to Puerto Rico which she declined.

## PROCEDURAL HISTORY

On December 9, 1988, a grand jury in the Middle District of Georgia indicted Whittaker, Walker, Callier, McCaskill, Frink, and John Lee Evans of conspiracy to aid and abet the possession of cocaine with the intent to distribute, in violation of 21 U.S.C. § 846; aiding and abetting the possession of cocaine with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1); and counseling Ruales and Delgado to travel in interstate commerce with the intent of facilitating the possession of cocaine with the intent to distribute, in violation of 18 U.S.C. § 1952. Walker, McCaskill, and Evans pleaded guilty, and Whittaker remained at large at the time of trial.[2] A jury convicted Callier and Frink on all three counts.

## CONTENTIONS OF THE PARTIES

Frink contends that the evidence is insufficient to support her convictions, that the district court improperly instructed the jury, and that the district court improperly excluded certain evidence. Callier contends that his right to a speedy trial was violated and that the district court erred in (1) admitting certain evidence, (2) failing to grant his motion for a directed verdict, (3) instructing the jury about CTRs, and (4) limiting his right to cross-examination.

## ISSUES

In this appeal we only address whether the government presented sufficient evidence to support Frink's convictions.[3]

## DISCUSSION

We find all of Callier's contentions to be meritless and without sufficient weight to require discussion.

In reviewing for sufficiency of the evidence, we consider the facts in the light most favorable to the government. *United*

---

1. *See* 31 U.S.C.A. § 5313 (West Supp.1990) and its implementing regulation, 31 C.F.R. § 103.22(a)(1) (1987).

2. The government charged Evans in a superseding information and the district court transferred his case to the Eastern District of Michigan.

3. We find Frink's remaining contentions and all of Callier's contentions to be meritless.

*States v. Pantoja–Soto,* 739 F.2d 1520, 1524 (11th Cir.1984), *cert. denied,* 470 U.S. 1008, 105 S.Ct. 1369, 84 L.Ed.2d 389 (1985). All reasonable inferences and credibility choices must be made in favor of the jury's verdict, but if a reasonable trier of fact could not find that the evidence established guilt beyond a reasonable doubt, we must reverse. *Pantoja–Soto,* 739 F.2d at 1525.

■■ Count One of the indictment charged Frink with conspiracy "to aid and abet the knowing and intentional possession of, and to knowingly and intentionally possess with intent to distribute a Schedule II controlled substance...." To establish the existence of a conspiracy under 21 U.S.C. § 846, the government must first prove that two or more persons entered an agreement to violate the narcotics laws. *United States v. Blasco,* 702 F.2d 1315 (11th Cir.), *cert. denied,* 464 U.S. 914, 104 S.Ct. 275, 78 L.Ed.2d 256 (1983). In order to support Frink's conviction of conspiracy, the evidence also must establish beyond a reasonable doubt that Frink had knowledge of at least the essential objectives of that agreement and that she knowingly and voluntarily joined or participated in the narcotics crime. *See United States v. Pantoja–Soto,* 739 F.2d at 1525. To support a conviction for conspiracy, "[t]he government need not prove that the defendant had knowledge of all details or phases of the conspiracy. Rather, it will suffice to show that the defendant knew the essential nature of the agreement." *United States v. Meester,* 762 F.2d 867, 881 (11th Cir.), *cert. denied,* 474 U.S. 1024, 106 S.Ct. 579, 88 L.Ed.2d 562 (1985). The government may prove Frink's agreement by circumstantial evidence, through "inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." *United States v. Tamargo,* 672 F.2d 887, 889 (11th Cir.), *cert. denied,* 459 U.S. 864, 103 S.Ct. 141, 74 L.Ed.2d 119 (1982) (quoting *United States v. Spradlen,* 662 F.2d 724, 727 (11th Cir.1981)). In addition, "[a] defendant's knowing participation in the conspiracy may be established by proof of acts committed by him that furthered the purpose of the conspiracy." *Meester,* 762 F.2d at 881.

■ Through the confessions of Walker, McCaskill, Ruales, and other means the government proved that a conspiracy to possess and distribute cocaine existed. The question is whether the government proved that Frink had knowledge of the essential elements of the conspiracy and whether she knowingly and voluntarily joined it. The government contends that by flipping titles on out-of-state vehicles and by structuring bank deposits to avoid CTR requirements, Frink demonstrated her knowledge of and voluntary participation in the narcotics conspiracy. Frink contends that no evidence demonstrated that she had knowledge of the "essential elements" of the narcotics conspiracy, or that she knowingly joined it.

In *United States v. Falcone,* 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940), the Supreme Court considered whether distributors of sugar and yeast who knew that the buyers were making illegal alcohol with the goods were guilty as co-conspirators. The Court held that "one who *without more* furnishes supplies to an illicit distiller is not guilty of conspiracy even though his sale may have furthered the object of the conspiracy to which the distiller was a party but of which the supplier had no knowledge." *Falcone,* 311 U.S. at 210–11, 61 S.Ct. at 206–07. What "more" evidence would be found to support a conviction of conspiracy became clear in *Direct Sales v. United States,* 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943). In *Direct Sales,* the Court upheld the conspiracy conviction of a drug wholesaler who sold morphine in abnormal quantities to a rural physician over a long period of time. The Court distinguished *Falcone* on the facts: In *Falcone* the commodities sold were innocent in themselves, sugar and yeast, while in *Direct Sales* the commodity was a restricted drug morphine. In *Falcone,* the sales by some of the defendants constituted only a single or casual transaction, while in *Direct Sales,* purchases were regular, continuous, and of a quantity inconsistent with legal usage. The seller also had stimulated illicit sales through quantity discounts and high pressure advertising. In *Direct Sales,* the

Court recognized the continuing validity of *Falcone's* holding that mere knowledge by the seller that the buyer intends to use the commodity unlawfully, without more, will not support a charge of conspiracy. The Court held, however, that the government adequately proved the drug wholesaler's guilt of conspiracy because of the prolonged cooperation with the physician's purpose. Under those circumstances, "the supplier not only knows and acquiesces, but joins both mind and hand with him to make its accomplishment possible. The step from knowledge to intent and agreement may be taken." *Direct Sales*, 319 U.S. at 713, 63 S.Ct. at 1270.

This circuit recently considered whether the seller of an aircraft to marijuana smugglers was guilty of conspiracy with the smugglers. *United States v. Morse*, 851 F.2d 1317 (11th Cir.1988). We held the evidence sufficient to support Morse's conviction because the airplane was well suited for smuggling, Morse sold the airplane for twice its market value, all payments were made in cash of small bills, Morse sold the airplane to a twenty-three year old without any written contract or receipt, and Morse failed to either register his purchase of the airplane or provide the Federal Aviation Administration with documentation of the sale as required by law. *Morse*, 851 F.2d at 1320. We particularly focused on the fact that the jury could find that the excessive sale price of the airplane compensated Morse for the omission of lawfully required documentation from the sale.

As in *Morse*, the facts in this case support the inference that Frink had knowledge of the conspiracy's unlawful purpose and agreed to participate. Frink sold at least eleven automobiles to Callier and "flipped" titles during a one year period. She also provided false addresses on registration forms, falsified odometer statements, and divided cash payments in order to avoid CTR requirements. The most damaging evidence against Frink, as the evidence relates to narcotics, is evidence showing that Frink knew that Customs seized the first vehicle she sold Callier—the Winnebago. Many of the vehicles, like the Winnebago, never passed through the Ohio dealership; they were simply "Florida" vehicles that needed an Ohio tag. The bookkeeper at McFrink Chevrolet testified that she received $50 to $100 in addition to her regular salary for helping flip titles. Furthermore, when Frink learned of the investigation, she advised the bookkeeper that they should "get [their] stories straight."

These facts place this case somewhere on the continuum between *Falcone* and *Direct Sales*. *See United States v. Michelena–Orovio*, 719 F.2d 738, 750–51 (5th Cir.1983) (en banc), *cert. denied*, 465 U.S. 1104, 104 S.Ct. 1605, 80 L.Ed.2d 135 (1984) ("*Falcone* and *Direct Sales* must be viewed along a continuum of sales of goods to persons engaged in an unlawful conspiracy."). While vehicles are not restricted in the same manner as are drugs under the narcotics statutes, the sale of vehicles requires documentation of the transaction. Frink knowingly violated vehicle registration laws by listing false names and addresses on the registration forms. Deliberately falsified paperwork is even more indicative of guilty knowledge than the omission of paperwork in *Morse*, which we held supported an inference of intent. Although a single transaction of this type might not support a conviction of conspiracy, the sale of eleven vehicles with cash, all in-house deals, and the use of falsified documents on vehicles Frink never saw provides substantial circumstantial evidence to support the inference of Frink's willing participation in the conspiracy.

The lack of direct evidence that Frink knew that the vehicles would be used to transport cocaine is not fatal to the government's case. In *Morse*, the buyers of the airplane never discussed their intention to smuggle marijuana. Morse only learned of the smuggling after the fact. In that case, we considered that the airplane was ideally suited for smuggling because the absence of passenger seats left more room for hauling marijuana. In this case, flipping titles on "Florida" cars was Frink's affirmative act which rendered the vehicles ideally suited to the transportation of drugs. In addition, Frink knew that the Winnebago had been seized by customs from a chop shop in

**1418**

Miami where it was being modified to better transport drugs. Thus, we hold that sufficient evidence demonstrates Frink's knowledge of the essential elements of the conspiracy and supports Frink's conviction for conspiracy.

Because we affirm Frink's conviction of conspiracy, the evidence is sufficient as to the two other counts. "[T]he substantive crimes committed by a member of a conspiracy are attributable to other co-conspirators if the crimes are reasonably foreseeable as a necessary or natural consequence of the unlawful agreement." *United States v. Gualdado*, 794 F.2d 1533, 1535 (11th Cir.1986), *cert. denied*, 479 U.S. 1101, 107 S.Ct. 1327, 94 L.Ed.2d 178 (1987). Possession of cocaine with the intent to distribute it and violation of the Travel Act are clearly foreseeable crimes that other conspirators would commit.

## CONCLUSION

Callier and Frink's convictions are affirmed.

AFFIRMED.