**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Juby Deon BATTLE and Donald Shannon Bullard, Defendants–Appellees.**

No. 88–5423.

United States Court of Appeals,
Eleventh Circuit.

Jan. 8, 1990.

---

David F. Axelrod, Linda Collins Hertz, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellant.

Mark King Leban, Miami, Fla., for defendants-appellees.

Before CLARK and COX, Circuit Judges, and HENDERSON, Senior Circuit Judge.

PER CURIAM:

After the jury found each of the defendants-appellees Juby Deon Battle and Donald Shannon Bullard guilty of four drug-related charges, the United States District Court for the Southern District of Florida, believing the evidence to be insufficient to convict, entered a judgment of acquittal notwithstanding the verdict. The government appeals. Having meticulously examined the record, we find the evidence to be sufficient and reverse.

On January 12, 1988, a federal grand jury in the Southern District of Florida returned an indictment charging Bullard and Battle with conspiracy to possess with

intent to distribute at least five kilograms of cocaine, in violation of 21 U.S.C. § 846 (Count I); possession with intent to distribute at least five kilograms of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count II); conspiracy to import into the United States at least five kilograms of cocaine, in violation of 21 U.S.C. § 963 (Count III); and importation of at least five kilograms of cocaine into the United States, in violation of 21 U.S.C. §§ 952(a) and 960(a)(1), and 18 U.S.C. § 2 (Count IV).

At the trial, the jury heard the following evidence. On Sunday, January 3, 1988, a 1969 Beechcraft Queen Air 80 twin-engine aircraft bearing tail number N151S landed at the Fort Lauderdale International Airport, General Aviation Facility. The plane, which was loaded with luggage and toys, R.5–34, carried eight persons. At the controls was Battle. His friend and business associate Bullard, the airplane's owner, sat in the co-pilot's seat. In the rear, the six remaining passengers occupied the three seats behind the pilot. R.7–413. Riding in the back were Bullard's mother, Viola, his brothers Lopez and Donavaughn, his infant son Darmigo and acquaintances Birdie Rolle and her mother, Emma. Battle, knowing that a routine customs inspection was mandatory,[1] taxied the aircraft to the United States Customs building.

Upon leaving the plane, Bullard and Battle encountered Customs Officer Edwin Marrero, a dog handler who, on Sundays, conducted canine searches of aircraft at Fort Lauderdale. Ordinarily, there were no dog searches during the week days at that facility. R.5–30. Marrero had seen the plane taxi in, and for "some odd reason" its appearance made him suspicious. When Battle asked Marrero whether Emma Rolle could remain on board because of her serious back problem, the officer's initial curiosity intensified, and he resolved to "run" his dog, Rodney, through the airplane. R.5–35.

Marrero entered the plane and met Mrs. Rolle. He perceived that she was in great pain and as a result took the unusual procedure of conducting a canine search with a passenger on the aircraft. R.5–37. The dog quickly alerted at the front of the plane, indicating the possible presence of contraband. R.5–37. Marrero then requested that Battle and Bullard remove Mrs. Rolle from the plane. R.5–38; R.8–665. After removing Mrs. Rolle, Bullard and Battle, apparently unaware at this point that the dog had been on the airplane, then brought the baggage into the Customs building and completed the required paperwork. R.7–548; R.8–665.

Inside the Customs building, inspector Harold Hartford noticed that Battle and Bullard were acting suspiciously, displaying "rapid eye movement." R.6–128. To Hartford, the two appeared to be "very nervous." R.6–129. The inspector observed that Battle's hand was trembling. R.6–133. Both defendants denied that they behaved in such a manner. R.7–551; R.8–674.

At Marrero's request, Hartford was present during a second canine search of Bullard's aircraft. As before, Rodney alerted to the floor area on which the pilot places his feet. Hartford lifted the carpet, revealing an "inspection plate" attached to the floor with five screws (a number of screws were missing). R.7–144. Using a screwdriver, the inspector removed the screws and raised the plate, discovering a small well completely filled with packages. Although the packages were not tightly packed into the space, the well would not accommodate another one. R.7–147.

A field test performed on the contents of two of the nine packages indicated the

---

1. The United States Customs Service inspects all private aircraft arriving at Fort Lauderdale. R.5–41. At the discretion of the Customs inspector on duty, the intensity of a search may range from a "routine," visual inspection, in which baggage compartments are checked to ensure that nothing has been left on board, to an intermediate "accessible compartments" search, which entails the opening of unsecured hatches and requires no tools. A more rigorous "panel removal" search, in which the inspector, using tools, opens attached panels, also may be conducted. R.5–100–01.

presence of cocaine.[2]  Because the cocaine had been secreted in the inspection well, under a metal plate and carpeting, the odor of cocaine could not be detected by persons in the plane.  While both Marrero and Hartford expressed the opinion that the cocaine was "fresh" and suggested that it had been on the plane only a short time, R.5–56, 63; R.6–175, this observation was based upon the way the dog instantly alerted to the smell, and DEA chemist Katherine Churchill stated that the odor of cocaine is not necessarily affected by age, R.5–76.  When pressed, none of the government's witnesses really knew the length of time that the cocaine had been on board the aircraft.

Following the discovery of the contraband, Bullard and Battle were arrested and given *Miranda* warnings.[3]  Battle made a post-arrest statement, declaring, among other things, that he flew several times a week, mostly at night, and that never before had Customs at Fort Lauderdale used a dog to search his plane.  R.5–87–88.  Both defendants denied knowledge of the existence of the cocaine on the airplane.

Both the government and the defendants called aircraft mechanics to testify about the configuration of the Beechcraft Queen Air 80.  Much of this evidence was not in conflict.  For example, because the inspection well houses several moving parts, including the rudder actuator rods, rudder trim cables and brake hoses, all three of the aircraft experts agreed that placing foreign objects in the inspection well created an extremely dangerous situation, because of the great potential of the objects to impede the operation of these crucial controls.  This definitely rendered the aircraft "unairworthy."  But the experts quarreled, qualified and equivocated on the effect, if any, that the nine packages of cocaine would have had on the plane's performance, and a consensus was not reached.

Thomas Ferro, the government's expert, testified, "you probably could put something in [the inspection well] without interfering with [the operation of the plane] too much," however, "[i]f you had it jammed tight enough, [the pilot] would notice it." R.6–224.  According to this witness, if the cocaine packages were crammed into the well, the pilot would "feel something" when depressing the pedals, because he would not be able to push them "all the way."  R.6–224–25.

In contrast, Richard Ferro, the uncle of Thomas Ferro, testifying on behalf of the defendants, stated that the pilot would "not necessarily" feel friction from the controls rubbing against the cocaine in the inspection compartment, and that Battle "probably wouldn't even know" of the presence of contraband on the plane.  R.6–289.  However, Richard Ferro conceded that if enough foreign material were placed in the well, the rudder rods would not move and the pilot immediately would notice the plane's lack of maneuverability.  R.6–305.

Finally, William Littleton, the defendants' other aircraft expert, ventured the opinion that he "wouldn't think" there would "necessarily be any type of restriction on those rudder pedals for a pilot to know that [the nine kilograms of cocaine] were there.  R.6–325.  Because resistance is always encountered when pressing a rudder pedal, Littleton "wouldn't imagine the pilot would feel anything out of the ordinary unless something outright jammed a pedal."  R.6–326.  However, the witness did think that if the brake hoses were impeded by extraneous objects in the well, the pilot would feel it.  R.6–348.  Although Littleton agreed that a skilled pilot such as Battle would pay close attention to differences or changes in the way controls operate, R.6–354, he concluded that Battle could have flown the plane and not been aware of the cocaine's presence.  R.6–359.

---

**2.**  Later, the Drug Enforcement Administration (DEA) conducted a chemical analysis which determined that the packages contained about nine kilograms of 84% pure cocaine hydrochloride.  R.5–69.  On the street the cocaine would have been worth approximately one million dollars.  R.6–246.

**3.**  *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

If the experts disagreed as to the effect of the cocaine on the plane's handling, they generally concurred that to gain access to the inspection well required a fairly complicated, time consuming procedure. R.6–219–305, 336. Before the inspection plate can be lifted, the pilot's chair must either be moved or removed, depending on the size of the person doing the work. According to Richard Ferro, a layman would not know how to move the seat, although pilots and airplane mechanics certainly possess such knowledge. R.6–305–06. Next, the carpeting, which is either glued or fastened to the floor with sheet metal screws, must be pulled up. Finally, the screws holding down the cover must be removed. On the Queen Air, the cover normally is attached with ten to fifteen screws, but on Bullard's plane the plate had just five screws in place, said inspector Hartford, who had opened the hatch on January 3, 1988. R.6–144. Richard Ferro testified that he would need about fifteen minutes to open the well, R.6–305, and Littleton related that he himself had spent some ten or fifteen minutes entering the inspection compartment on a Queen Air similar to Bullard's, R.6–324. Both acknowledged that a less skilled individual would be unable to gain access as quickly, R.6–305, 335–36, and Littleton indicated that a layman might take up to forty-five minutes to complete the process, R.6–336.

A number of witnesses, including both defendants, described the events leading up to the defendants' arrest at Fort Lauderdale. At the request of Bullard's mother on January 1, 1988, the defendants planned a round trip flight to Bimini, for the apparent purpose of transporting Bullard's mother and other family members to Miami following the holidays. Because of bad weather the trip, originally scheduled for Saturday, January 2, 1988, was postponed until Sunday. On the morning of January 3, 1988, Bullard called his mother and made arrangements to meet the family at the Bimini airport that afternoon, around 2:00 P.M.

At 1:30 P.M. Battle filed a flight plan with Miami Flight Service, located at the Tamiami airport. The plan accurately listed the route (Tamiami to Bimini, returning to Tamiami by way of Fort Lauderdale), aircraft identification number and passengers' names. Because the Bimini airport lacks a control tower, the flight plan was forwarded to Nassau. Other than Bullard's family, the defendants told no one in Bimini about their plans. They boarded Bullard's Beechcraft between 2:30 and 3:00 P.M. and embarked on the thirty-minute flight, landing in Bimini around 3:00 or 3:20 in the afternoon.

The Bimini airport was crowded that day. The defendants quickly realized that their passengers were not at the airport, and, leaving the plane unlocked and unattended, they headed for the dock, hoping to greet Bullard's relatives there as soon as they arrived on the ferry from north Bimini. Shortly the Bullard family was reunited, but baggage inadvertently had been left behind, and the defendants remained at the dock to retrieve the suitcases, while the others proceeded to the airport. About thirty to forty-five minutes later, Bullard and Battle, who remained together the entire time they were in Bimini, returned to the airport with the luggage. Mrs. Bullard asked her son if there was room for the Rolles on the plane, and Bullard agreed to transport the ailing woman and her daughter to Miami. The defendants had not anticipated these additional passengers. After the luggage was loaded, the group departed for the United States, taking off at 4:30 or 5:00 P.M. Bullard's plane had been left alone for no more than ninety minutes that afternoon in Bimini. Once in the air, Battle activated the return flight plan and notified Customs of their impending arrival.

Bullard, a Bahamian citizen, primarily worked for his father, a businessman who owned "water taxi" and bus services, ferrying people from north to south Bimini. To supplement his income as a boat pilot and bus driver, Bullard occasionally worked on airplanes in the Bahamas for Richard Ferro, who operates an airplane repair station, FAMCO Aviation, at the Tamiami airport. Starting an air charter service was Bullard's father's idea, a ve-

hicle for setting his son up in business. The plan required a plane and a pilot. On November 6, 1987, the elder Bullard bought the Beechcraft Queen Air, putting title to the aircraft in the name of the defendant, Donald S. Bullard. Their choice for a pilot was the younger Bullard's best friend, Juby Battle. At the time, Battle, employed by FAMCO, was flying about three to five charter flights per week, carrying food, clothing, truck and tractor parts and passengers from south Florida to the islands. An American citizen, Battle applied for an American cargo license, while the Bullards filed for a Bahamian cargo license. Battle invested no money in the airplane.

The Beechcraft underwent an annual inspection which lasted from November 7, to December 1, 1987. An exhaustive procedure, every access plate was opened, every inspection area checked. The plane then was brought to FAMCO, where it was housed. Security at FAMCO was "pretty good," R.6–314, but, because breaking into airplanes is "not that hard," R.6–214, thefts of radios and navigation equipment as well as vandalism were often reported. Between November, 1986 and January, 1987, Thomas Ferro augmented FAMCO's regular security patrol by sleeping at the facility in the company of his pit bulls. During that period, according to Thomas Ferro, no crime occurred at FAMCO. R.6–214.

On seven separate occasions in December, 1987, Bullard's Beechcraft passed through Customs at Fort Lauderdale, and Customs inspected the plane each time. Of the seven flights, Battle piloted four.[4] James J. Jones flew the remainder.[5] Customs conducted a secondary search on December 18, 1987, routine inspections on December 20, 23, 24 and 27, 1987, and intrusive panel searches on December 21 and 24, 1987. Not searched was the inspection area where Customs discovered the cocaine on January 3, 1988, nor was a dog used on any of those occasions.

When Customs opens or removes an interior inspection plate, it does not replace it. Rather, the pilot is issued a written warning which states, in part:

Compartments and panels that were opened or removed have been left open so that you will be aware of the extent of our search.

Your aircraft may not be airworthy as a result of this inspection and we recommend that it be inspected by an FAA licensed aircraft and engine mechanic before being flown.

Government's Exhibit No.1(a). Customs officials left this notice with the pilots of Bullard's airplane after panel searching it on December 21 and December 24, 1987. Battle's signature appears on the warning dated December 21, 1987. Bullard admitted that he "[paid] attention to all notices. Yes, I look[ed] at them. I read them." R.7–568.

James Jones, a pilot and airplane mechanic, worked at FAMCO and, like Battle, flew charter flights to the islands. Jones took Bullard's plane and a paying passenger to Bimini on December 23, 1987, filling in for Battle, who was ill. Mechanical difficulties grounded the plane in Bimini that day, and Jones returned to Tamiami on another charter flight. After picking up the necessary airplane parts, Jones traveled back to Bimini, repaired Bullard's plane and flew home, arriving at Fort Lauderdale around 7:30 P.M. Jones had left the Beechcraft unattended for about seven to eight hours at the Bimini airstrip.

Refusing to honor the government's subpoena, Jones failed to appear and testify at the trial. Both sides wanted Jones' testimony. The district court reviewed Jones' grand jury testimony to determine whether it contained exculpatory material and concluded that available witnesses would suffice to cover points addressed by Jones.

Taking the stand in his own defense, Bullard disclaimed knowledge of the inspection well where the cocaine was secreted. Indeed, although he acknowledged

---

**4.** December 18, 20, 21 and 27, 1987.

**5.** December 23 and December 24, 1987 (morning and afternoon).

having once done some electrical work on the Beechcraft, Bullard confessed to understand little about his airplane and its layout.[6] Nonetheless, Bullard admitted knowing there are inspection plates located throughout the aircraft, and he claimed to be capable of locating the inspection area involved here without much difficulty. R.7–573–74. "[Y]ou don't have to be [a great mechanic to find the deck plate]," he said. "All you have to do is dig up the aircraft until you find something." R.7–573.

Battle, testifying in his own behalf, professed to know next to nothing about "inspection plates on aircraft in general": "I'm not a mechanic. I don't deal in that area." R.8–720. In addition, he denied being familiar with the location of the inspection well underneath the pilot's seat in Bullard's plane. R.8–721. This despite the fact that Bullard had flown about 1200 total hours, including 700–900 hours in multi-engine airplanes. And of these, he had some 25 hours in Beechcraft Queen Airs, including approximately ten hours of flight time in N151S. Battle conceded that he could find the inspection areas "if [he] wanted to...." R.8–722.

Battle declared that he would not have flown the aircraft had he been aware of the contraband in the inspection compartment, stressing the danger inherent in obstructing primary controls—"a crash and burn situation." R.8–677. But he emphasized that the plane's controls did not respond any differently on the day in issue, that the plane felt normal, except for a slight sluggishness in the handling due to the number of passengers and amount of cargo. In short: "If those packages were there when I flew the aircraft to Bimini, it didn't make any difference." R.8–688.

Battle claimed to have been on the plane only once when Customs performed more than a routine search of the Beechcraft. R.8–726.[7] Acknowledging that he had received the Customs warning issued December 21, 1987, advising that panels had been opened, Battle asserted that, contrary to the written notice, the inspectors "did not leave the panels opened." R.8–724. He added, "All I can tell is I didn't find any panels opened and I was issued this warning." R.8–724–25. Asked about dog searches, Battle stated that none of the planes he had flown into Fort Lauderdale had been the subject of a canine search, although he had had that experience at the Opa–Locka airport. R.8–727–28.

Where, as here, jury verdicts of guilty are set aside by the district court by entering a judgment of acquittal based on insufficiency of the evidence, the district court's decision "is entitled to no deference." *United States v. Greer*, 850 F.2d 1447, 1450 (11th Cir.1988). Under our standard of review,

> [i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. A jury is free to choose among reasonable constructions of the evidence.

*United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (*en banc*) (footnote omitted), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).[8]

---

**6.** When asked whether he could perform repairs on a Beechcraft, Bullard responded, "No, I am not aware—I am not familiar with the Beechcraft." R.7–525. Answering the question, "[W]hat was on the floor by the pilot and co-pilot seat?" Bullard said: "The only thing I know is carpet ... [a]nd under the carpet, sheet metal." R.7–528. He explained his lack of specific knowledge about the Beechcraft by pointing out that all makes and models differ, and that as a newly licensed mechanic with limited experience he could not be expected to have such intimate familiarity with any particular aircraft. R.7–424–28.

**7.** In fact, when Battle was the pilot of the plane Customs conducted two intrusive searches, according to the record. Government's Exhibit No. 21. In addition to the December 21, 1987, panel inspection discussed in the text, the plane was given a secondary inspection on December 18, 1987.

**8.** In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982), the Eleventh Circuit adopted as precedent all decisions of Unit B of the former Fifth Circuit.

We examine the evidence in the light most favorable to the government, resolving all credibility choices and drawing all reasonable inferences in support of the jury's verdict. E.g., *Greer*, 850 F.2d at 1450; *United States v. Cruz–Valdez*, 773 F.2d 1541, 1544 (11th Cir.1985), *cert. denied sub nom., Ariza–Fuentes v. United States*, 475 U.S. 1049, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986).

■ The often repeated elements of the drug crimes charged in this case regrettably are all too familiar:

> To prove the offense of conspiracy, the government must demonstrate that an agreement existed between two or more people to commit a crime, that the accused had knowledge of at least the essential objectives of that agreement, and that armed with that knowledge, he voluntarily joined or participated in the illegal venture. Even if a defendant did not join the conspiracy until after its inception, and even if he played only a minor role in the whole scheme, he may still be convicted. Inferences from the conduct of the alleged participants or from other circumstantial evidence of a scheme may provide the basis for establishing that a conspiratorial agreement existed.
>
> Likewise, possession of a controlled substance with intent to distribute may be proved by circumstantial as well as direct evidence. Intent to distribute may be inferred from the amount of contraband. Possession may be either actual or constructive; if the accused exercised 'some measure of dominion or control over the contraband,' either exclusively or in association with others, he constructively possessed it.

*United States v. Pantoja–Soto*, 739 F.2d 1520, 1525 (11th Cir.1984), *cert. denied*, 470 U.S. 1008, 105 S.Ct. 1369, 84 L.Ed.2d 389 (1985) (citations omitted). Because the presence of a large quantity of cocaine on board Bullard's aircraft was not disputed evidence sufficient to convict the defendants of conspiracy to possess with intent to distribute also would suffice to convict them on the possession charge. *United States v. Mosquera*, 779 F.2d 628, 630 (11th Cir.1986); *Cruz–Valdez*, 773 F.2d at 1544.

The statute proscribing the substantive offense of importation, 21 U.S.C. § 952(a) provides: "It shall be unlawful ... to import into the United States from any place outside thereof, any controlled substance in Schedule I or II of subchapter I of this chapter...."⁹ For purposes of proving importation under this section, any point outside the twelve-mile limit of airspace and waters representing the extent of customs territory constitutes a "place outside" the United States. *United States v. Lueck*, 678 F.2d 895, 905 (11th Cir.1982).¹⁰ The government need not show a precise point of origin on foreign soil to prove a violation of § 952(a). Rather, "[t]he fact of crossing the boundary of the United States with contraband suffices to establish importation." *Id.* However, if the evidence were sufficient to prove that the defendants knowingly joined a conspiracy to import cocaine, then no additional evidence would be necessary to support their convictions on the substantive count, for it charges them with an event which occurred while both actively participated in the alleged conspiracy. *United States v. Johnson*, 575 F.2d 1347, 1366–67 (5th Cir.1978), *cert. denied*, 440 U.S. 907, 99 S.Ct. 1213–14, 59 L.Ed.2d 454 (1979).¹¹

In its written judgment of acquittal the district court described what, in its view, were the deficiencies in the government's case:

> In this case, there could have been no reasonable doubt that cocaine was stored in the plane which was flown by the defendants from Bimini in the Bahama Islands to Fort Lauderdale, Florida in the United States. However, the record was

---

9. Cocaine is listed in Schedule II of subchapter I of Title 21, chapter 13. See 21 U.S.C. § 812(c).

10. Bimini, an island in the Commonwealth of the Bahamas, clearly is outside the customs territory of the United States.

11. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), the Eleventh Circuit adopted as precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981.

devoid of evidence that the defendants, or either of them, placed the contraband aboard the plane or conspired to do so. Also the record failed to show that the contraband was placed aboard the airplane with the knowledge, consent or complicity of the defendants, or either of them. Moreover, any reasonable inference that could be drawn from the evidence presented does not show beyond a reasonable doubt that the contraband was placed aboard the plane with the knowledge, consent or complicity of the defendants, or either of them. Accordingly, the reasonable doubt standard has not been met.

R.2–85.

The government contends that the circumstances, in their totality, support the jury's conclusion that no one could have placed the cocaine in the inspection area of Bullard's aircraft without the defendants' collaboration. Noting that on January 3, 1988, the aircraft was unattended for at most ninety minutes, the government theorizes that an unrelated third party would not have had sufficient time to locate the inspection well, open it, conceal the cocaine, and replace the inspection plate, carpeting and seat, placing the pieces back in precisely the same positions so as not to arouse the pilot's suspicion. Further, because no one in Bimini, other than Bullard's family, had been informed of the defendants' travel plans, a stranger could not have planned in advance to make the defendants unwitting cocaine couriers.

Moreover, according to the government, had a stranger planted the cocaine on Bullard's airplane, the defendants would have found it. Because the jury could reasonably have concluded that the contraband filled the inspection well completely and therefore caused resistance in the operation of the aircraft's controls, the jury additionally could have inferred, reasonably, that Battle, an experienced pilot, would have felt something unusual and investigated its cause. Also, the government posits that the defendants were uniquely positioned to select the inspection well as a hiding place, because they had been through many prior Customs searches.

This, the government observes, gave them in effect a "road map," directing them to a container not likely to be opened.

Finally, the government stresses that the possibility of a stranger hiding cocaine valued at close to one million dollars on a plane over which he could exercise no control was so unlikely as to be properly rejected by the jury as unreasonable. The government urges that a rational trier of fact is entitled to conclude that prudent drug dealers do not enlist untainted individuals to assist in smuggling operations.

The defendants characterize this as an archetypal "mere presence" case, reminding us that "this court has frequently affirmed that the mere presence of a defendant at a place where contraband is discovered is not sufficient to establish guilt." Cruz–Valdez, 773 F.2d at 1544 (collecting cases). The defendants attack the government's premise that the cocaine packages were so tightly squeezed into the inspection compartment that Battle probably would have noticed some resistance. According to the defendants, the evidence showed that the cocaine was loosely packed and did not interfere with the controls. They further emphasize that no odor betrayed the presence of the cocaine on the plane, and no scientific evidence linked it to the defendants. Despite the availability of scientific testing facilities, no such tests were conducted.

As an additional "reasonable doubt factor," the defendants point out that several of Bullard's family members, including his infant son, were aboard the plane, and suggest that they would not knowingly have subjected either these innocent passengers or themselves to the danger of flying with foreign objects in the inspection well.

Accusing the government of "rampant and baseless theorizing," the defendants name James Jones as the most likely culprit. They explain that he, or anyone, could have hidden the contraband on December 23, 1987, the day Jones left the plane unattended in Bimini to retrieve parts for its repair.

The parties cite some instructive cases, though none is on point. In *United States v. Rutkowski*, 814 F.2d 594 (11th Cir.1987), relied upon by the government, this court held that proof of the defendant's physical presence on board a private aircraft containing 130 kilograms of cocaine, coupled with other circumstantial evidence, was sufficient to convict the defendant, Rutkowski, on charges of cocaine conspiracies and substantive offenses. In that case, the airplane's pilot had aroused suspicion by not using the plane's transponder, a radio beacon necessary for instrument flight. Also, he had not filed a flight plan, and the plane's lights were not operating. *Id.* at 596. Summarizing the other circumstantial evidence, the court wrote:

> There was a relatively large amount of cocaine (130 kilograms) contained in a relatively small space. The rear passenger seats had been removed from the airplane, and the cocaine was in *unlocked* containers easily accessible to anyone sitting in the co-pilot's seat. According to evidence introduced at trial, Rutkowski is an FAA certified mechanic, and the fuel log indicates that he took an active part in the flight as a member of the air crew. Furthermore, trial testimony established that fueling from jugs in the manner indicated by the fuel log is extremely difficult, if not impossible without help. Reasonable jurors can believe that drug dealers do not invite untainted persons to assist in operating a vessel carrying millions of dollars worth of contraband.

*Id.* at 599–600.

While conceding that the cocaine was more readily accessible in *Rutkowski*, the government likens that case to this one, noting that Bullard, like Rutkowski, is an FAA certified mechanic who took an active part in the flight. But the *Rutkowski* decision is readily distinguishable in several respects. First, Battle filed—and adhered to—a flight plan, obtained a transponder number and, to all outward appearances, did nothing unusual while in the air. Also,

the plane was not visibly altered nor stocked with supplies, such as extra fuel cans, indicating a lengthy journey. Most important, though, is the fact that in *Rutkowski*, the cocaine was barely concealed, while here the controlled substance was well hidden. Nevertheless, the case underscores the proposition that where "the evidence establishes not mere presence but presence under a particular set of circumstances ... an examination of all of the proved circumstances, including presence, [is required] to determine whether from them a reasonable jury could infer and find beyond a reasonable doubt knowing and intentional participation." *Cruz–Valdez*, 773 F.2d at 1545. In *Rutkowski*, the totality of the circumstances created a pattern of guilt sufficient to support the jury's conclusion. That, says the government is precisely the situation here.

The defendants point to *United States v. Vidal–Hungria*, 794 F.2d 1503 (11th Cir. 1986), in which this court held that the presence of 23 tons of marijuana stored in tightly sealed compartments on a 156–foot coastal freighter was of itself insufficient to convict the *crew* of conspiracy and possession of contraband with intent to distribute it. However, this result was compelled by the total lack of evidence against the crew members, *id.* at 1515, and "the fact that the marijuana was so well sealed that a crew member would not ordinarily have seen it or smelled it," *id.* at 1514. Indeed, the Coast Guard officers who searched the vessel would, in all likelihood, have overlooked the marijuana but for the fortuity that one tall officer happened to stand for more than an hour near the sealed vent leading to the hidden compartment, enabling him to detect the negligible odor emitted by the contraband. *Id.* The effective concealment of the marijuana neutralized the so-called "large quantity factor" identified by this court in *Cruz–Valdez*.[12]

This case could be said to resemble *Vidal–Hungria* because the cocaine secreted on Bullard's plane, like the marijuana on

12. In *Cruz–Valdez*, 773 F.2d at 1546, the court explained that the existence of a large quantity of contraband on a small vessel is a significant

circumstance from which a jury can infer that the persons on board the vessel must have known of its presence.

the freighter, was so completely hidden that a jury could not reasonably infer that all persons on the airplane knew of the cocaine's presence. A crucial fact distinguishes *Vidal–Hungria* from the present case, however. In *Vidal–Hungria* the convictions of the ship's *captain* were affirmed. Indeed, the captain did not challenge the sufficiency of the evidence supporting his convictions. *Id.* at 1515 n. 12. As the court noted, the "large quantity factor" was "much more significant in the government's case against" the vessel's captain, because the captain's responsibilities necessitated "knowing the existence of a large weight of cargo below deck." *Id.*

■ Here, Battle is analogous to the captain in *Vidal–Hungria*, and the status of the other passengers, excluding Bullard, is more akin to that of the crew. The regular pilot of a small, private plane is unlike a hired hand aboard a large, ocean-going freighter. The facts of this case—a sizeable quantity of cocaine packed into a cramped compartment containing crucial controls—while perhaps not lending themselves to an inference that *all* persons on the airplane knew of the presence of the contraband, see *id.* at 1514, certainly do support a reasonable inference that the *pilot* felt the foreign material and, because of the pilot's responsibility to investigate any irregularity in the plane's performance, the additional inference that he knew of the nature of the clandestine cargo. And Bullard, unlike the crew members in *Vidal–Hungria*, was the owner of the aircraft. He was not a passive investor but rather an active participant overseeing the use of his plane. Although he did not actually fly the Beechcraft, Bullard knew who did, and where it was taken, and when. See R.7–531–34. Furthermore, on January 3, 1988, Bullard spent the entire day in Battle's presence. Thus, the jury could infer that Battle could not have sneaked the cocaine onto Bullard's plane without alerting Bullard. These facts, together with the evidence of the defendants' suspicious conduct while inside the Customs building, support the reasonable inference that both Bullard and Battle knew of the cocaine's existence and whereabouts.

Despite the lack of direct proof showing that the defendants or an unnamed coconspirator hid the cocaine on Bullard's plane, we hold that the evidence, viewed in the light most favorable to the government, established facts from which the jury could reasonably infer that Battle and Bullard knowingly and voluntarily participated in the crimes charged. The circumstantial evidence here simply cannot "be squared with endless hypotheses of innocence." *Pantoja–Soto*, 739 F.2d at 1527. The alternative scenario offered by the defendants, though properly presented to the jury, did not require the jurors to entertain a reasonable doubt about the defendants' guilt, for a number of reasons.

■ First, the jury was entitled to find that the cocaine was in fact put on the plane in Bimini on January 3, 1988. The defendants' theory that Jones planted the cocaine on December 23, 1987 (the day of the mechanical problem in Bimini), while remotely possible, is not so compelling as to mandate such a finding. Plainly the jury, using its common sense or general knowledge about commerce in controlled substances, *Cruz–Valdez*, 773 F.2d at 1547, could reject as incredible the notion that a prudent drug smuggler would allow merchandise valued at one million dollars to sit on board someone else's airplane for nearly two weeks, all the while risking discovery of the goods by the defendants, FAMCO employees or Customs, or movement of the airplane to an unknown location, see *id.* The idea that Jones, if the culprit, would allow the cocaine to remain on the plane is further rendered implausible by the fact that on December 24, 1987, Customs conducted a panel search of Bullard's airplane while Jones was the pilot. The jury might reasonably have inferred that if Jones were the smuggler he would not have waited to remove the cocaine after watching Customs officers tear apart the airplane that day.

Once the jury came to the reasonable conclusion that the cocaine was concealed on January 3, 1988, the circumstantial evidence of the defendants' culpability became

strong. Because the plane was on the ground in Bimini for at most ninety minutes, the jury was permitted to find that only the defendants, or someone acting in concert with them, could have committed the crime. And, because there was testimony that the cocaine was packed in the inspection compartment so as to affect the controls, the jury could infer that Battle necessarily knew that the packages were in the well. To accept the defendants' argument to the contrary on this point would require us to view the evidence in the light most favorable to the *defendants*, an effort this court is not authorized to undertake.

■ Finally, the jury reasonably could have rejected the defendants' argument that they would not expose friends and family to the risk of death associated with crowding drugs around important aircraft mechanisms. The jurors, again consulting their general knowledge of the drug trade, could conclude that these drug smugglers were less concerned about the welfare of others than excited by the prospect of personal enrichment. In short, the jury could find that the defendants believed the reward to be commensurate with the risk.

The totality of circumstances being sufficient to establish guilt beyond a reasonable doubt in the minds of reasonable jurors, the judgment of acquittal must be reversed and the case remanded for sentencing.

REVERSED and REMANDED.

CLARK, Circuit Judge, dissenting:

I respectfully dissent. I have read the trial transcript. Judge Paine was correct in ruling that the government failed to prove its case beyond a reasonable doubt:

> If the evidence is so scant that the jury could only speculate or conjecture as to a defendant's guilt, verdicts of guilty will not support judgments of guilty. If the trial court concludes, on the evidence submitted, a reasonably minded jury must have had a reasonable doubt as to a defendant's guilt, the motions for judgment of acquittal must be granted. *See*

*United States v. Vidal–Hungria,* 794 F.2d 1503, 1513 (11th Cir.1986). Record, Vol. 2 at 85. (See also further quotations from Judge Paine's Order, Majority op., 999–1000.) The fingerprints on the cocaine packages were not those of the defendants nor of the agents who handled the packages. The government failed to connect the defendants to the cocaine except by inference.

Battle testified that he did not "feel" the presence of any obstructions that interfered with the piloting of the plane. The experts testified that the soft packages of cocaine in the compartment might or might not impact upon the cables passing through the compartment.[1] Nevertheless, the majority concludes that because the cocaine found on the plane when it reached Ft. Lauderdale "support[s] a reasonable inference that the *pilot* felt the foreign material and, because of the pilot's responsibility to investigate any irregularity in the plane's performance, the additional inference that he knew of the nature of the clandestine cargo" may be drawn. Majority op., at 1002. The majority's unsupported conclusion [that the cocaine affected the controls] then pyramids into inferences of guilt.

With the assumption that the cocaine was put on the plane on January 3, and that the plane was on the ground in Bimini only 90 minutes, the majority concludes "the jury was permitted to find that only the defendants, or someone acting in concert with them, could have committed the crime." I agree that the jury "could" have reached such a conclusion, but I do not agree that they could have done so "beyond a reasonable doubt." Judge Paine acknowledged that the defendants might have been guilty, but he was correct in concluding there were doubts to which reasons could be attributed.

I would affirm the district court's judgment of acquittal.

1. See page 995 of the Majority opinion.