[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 30, 2008
THOMAS K. KAHN
CLERK

_____

No. 06-15963
Non-Argument Calendar

_____

D. C. Docket No. 05-14096-CR-DLG

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SCOTT THOMAS FREEDMAN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(May 30, 2008)**

Before ANDERSON, HULL and FAY, Circuit Judges.

PER CURIAM:

Scott Freedman appeals his convictions for conspiracy to import five kilograms or more of cocaine and attempt to import five kilograms of more of cocaine, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 952(a), 960(b)(1), and 963.[1] Freedman argues that (1) the district court erred in refusing to strike the entire jury panel after one prospective juror's biased comments and (2) the government failed to present sufficient evidence that he agreed with a non-government agent or informant to import cocaine, made a substantial step toward importing cocaine, or knew that five kilograms or more of cocaine were involved in the deal. For the reasons discussed below, we affirm Freedman's convictions and sentences.

## I. Motion to Strike Jury Panel

At jury selection, the government and Freedman took turns questioning and challenging prospective jurors until a jury of 14 was selected. During its first round of questioning, the government asked the prospective jurors if any of them would give extra weight to the testimony of a police officer. A prospective juror named Raymond Thoennissen responded that, if "[t]he [Drug Enforcement Agency ("DEA")] brought this case, [Freedman was] probably guilty." At the conclusion

---

[1] Freedman also was indicted for importing five kilograms or more of cocaine, also in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 952(a), 960(b)(1), and 963, but the jury found him not guilty of this charge. At sentencing, freedman was held responsible for 7 kilograms of cocaine and sentenced to two concurrent 121-month terms of imprisonment.

2

of the government's first round of questioning, Freedman requested a sidebar and moved to strike the jury panel, arguing that Thoennissen's statement "may have sent the message, the idea, across [the] entire panel in [the] room that this defendant is guilty." The district court denied the motion.

During his first round of questioning, Freedman asked the prospective jurors if any of them would have difficulty presuming that he was innocent until proven guilty or holding the government to its burden of proving his guilt beyond a reasonable doubt. None of the prospective jurors responded affirmatively. At the conclusion of the first round of questioning, Thoennissen was dismissed from the jury panel, along with other prospective jurors.

During the next four rounds of questioning, the government and Freedman asked many of the new prospective jurors if any of them would give extra weight to the testimony of a police officer. None of the prospective jurors responded affirmatively. Freedman also asked all of the new prospective jurors if any of them would have difficulty presuming his innocence or applying the beyond-a-reasonable-doubt standard. Only one prospective juror expressed difficulty with these standards, and she was dismissed.

After the jury was empaneled, the district court instructed the jury that its job would be to decide a verdict based only on the evidence and law that it would

hear in the courtroom during the trial.

At the beginning of the trial, the district court reminded the jury that it must base its verdict only on evidence presented from "the witness stand in the form of testimony and documents and exhibits received." The district court instructed the jury that it must apply the appropriate law to this evidence, regardless of whether "[the individual jurors] agree[d] with [the law] or not." The district court also reminded the jury that Freedman was presumed innocent until proven guilty and that the burden of proving his guilt beyond a reasonable doubt rested entirely on the government.

At the end of the trial, before submitting the case to the jury for its consideration, the district court again reminded the jury that it must make its decision "only on the basis of the testimony and other evidence presented [in the courtroom] during the trial." The district court also reminded the jury that the government had the burden of proving Freedman's guilt beyond a reasonable doubt and that the jury "must follow the law as [the district court] explain[ed] it to [the jury] whether [it] agreed with that law or not." The district court further admonished the jury that the "testimony of police officers or federal agents [was] to be given no more or less weight than the testimony of other witnesses."

We review the district court's denial of a motion to strike the jury panel for

4

abuse of discretion. See United States v. Tegzes, 715 F.2d 505, 507 (11th Cir. 1983). "The constitutional standard of fairness requires that the criminally accused have a panel of impartial, indifferent jurors." Id. In determining whether this standard has been met, we generally presume that the jury was impartial. See id. at 509. We also generally give deference to the decision of the district court judge who presided over jury selection, as he was in the best position to observe the demeanor of the jurors and determine whether they were impartial. See id. In United States v. Khoury, 901 F.2d 948, 955 (11th Cir. 1990), we held that a party challenging the presumption of impartiality and deferential treatment "must demonstrate that the juror in question exhibited actual bias: That is, either an express admission of bias, or proof of specific facts showing such a close connection to the circumstances of the case that bias must be presumed."

The district court did not abuse its discretion by refusing to dismiss the entire jury panel after Thoennissen stated that Freedman must be guilty because the DEA had brought a case against him. See Tegzes, 715 F.2d at 507. Freedman has not demonstrated that the jury members were biased, either expressly or because of a close connection to the case. See id. Indeed, the evidence demonstrates the exact opposite. No prospective juror, after Thoennissen, stated that he or she would give extra weight to the testimony of a law enforcement officer. Also, the

only prospective juror who expressed difficulty with the presumed-innocent and beyond-a-reasonable-doubt standards was dismissed. Moreover, the district court repeatedly instructed the jury that it could consider only the evidence offered at trial, must follow the law whether its individual members agreed with the law or not, must presume Freedman innocent and could not convict him unless the government proved his guilt beyond a reasonable doubt, and could not give extra weight to the testimony of a law enforcement officer. Thus, because Freedman has not satisfied the burden set out for him in Khoury, the district court did not abuse its discretion and we affirm Freedman's convictions and sentences as to this issue. See Tegzes, 715 F.2d at 507; Khoury, 901 F.2d at 955.

We note that Freedman argues that Thoennissen's statements constituted grounds for dismissal because it had to do with Freedman's guilt or innocence. In making this argument, Freedman cites our language in Khoury that the statement of a prospective juror in a drug-trafficking case that her son had overdosed before he was 18 was not grounds for dismissing the entire panel in part because it did not raise a "spectre of potential prejudice in other jurors" since it "did not constitute an opinion concerning the guilt or innocence of the defendants, nor did it relate to knowledge about the facts, parties, or witnesses involved in this case." Id. at 956 (citing Tegzes, 715 F.2d at 506-09). We find, however, that Thoennissen's

6

statement was not the sort of statement we described in <u>Khoury</u>, in that it did not illustrate Freedman's actual guilt to the other prospective jurors. <u>See</u> <u>Khoury</u>, 901 F.2d at 955. Thoennissen did not state, for instance, that he knew Freedman to be guilty of importing cocaine because he overheard Freedman talk of importing cocaine, saw Freedman with cocaine, or knew one of the co-conspirators. Statements of this sort certainly may have raised the "spectre of potential prejudice" we mentioned in <u>Khoury</u>. <u>See</u> <u>id</u>. Such was not present here.

## II. Sufficiency of the Evidence

During the trial, Edwin Deveaux, one of Freedman's codefendants, testified that he lived in the Bahamas. He agreed to supply cocaine for Ray Taylor, another of Freedman's codefendants, to smuggle into the United States. Specifically, he indicated that he could supply approximately 70 to 80 kilograms, which he expected would sell for $17,000 to $17,500 per kilogram in the United States. On the day that Taylor came to retrieve the cocaine, however, Deveaux only gave him three kilograms of cocaine. He explained to Taylor that his supplier had decided to use three kilograms of cocaine as a "test run," but that he expected to provide approximately 40 kilograms for later runs. On cross-examination, Deveaux admitted that he always knew that he first would give Taylor three kilograms of cocaine as a test. He also admitted that he only communicated with Taylor, and

7

with Taylor's brother, about the drug deal. On redirect examination, Deveaux testified that, while he communicated directly with Taylor and his brother only, he knew that others were involved because Taylor told him that Taylor would have help offloading and stashing the cocaine in the United States.

Taylor testified that he was an informant for the DEA. After setting up the drug deal with Deveaux, he told Freedman that he was "run[ning] a load [of cocaine]" and needed to use Freedman's boat to do so. Taylor told Freedman that he expected to earn approximately $200,000 to $250,000 from selling his portion of the cocaine. Freedman insisted that he "wanted in on" the deal, and Taylor agreed to let Freedman pick up and help stash the cocaine once it was in the United States. At the DEA's request, Taylor arranged a meeting with Freedman for November 7, 2005, and recorded their conversation. During the meeting, Taylor asked Freedman if he remained interested in the deal, and Freedman responded that he was "in." Freedman and Taylor then briefly discussed the amount of cocaine to be imported. At one point, Freedman said, "Don't worry[,] the last time they said there were 7. . . ."

On November 16, 2005, Taylor used Freedman's boat to travel to the Bahamas and retrieve the cocaine from Deveaux. On his return trip, DEA agents stopped Taylor and confiscated the cocaine. When Taylor arrived back in the

8

United States, he expected Freedman to meet him at the marina. Freedman did not meet him but later called Taylor and explained that he had been watching Taylor from behind the marina and had decided not to meet Taylor as planned because he noticed law enforcement officers around the marina.

Nicholas Kent, a DEA special agent, testified that he was assigned to work undercover with Taylor, assuming the role of a friend of Taylor's who would help Freedman pick up and stash the cocaine. In the course of his undercover work, he met with Freedman several times and recorded their conversations. During their first conversation, on November 10, 2006, Kent and Freedman discussed how Taylor's trip to the Bahamas to retrieve the cocaine kept being delayed. When Kent stated that Deveaux claimed the delays were Taylor's fault, Freedman responded, "Now listen[,] I was there. I heard the whole conversation right[,] um[,] on their end. They're unprepared. The numbers keep changing." Freedman went on to say, "He put them on speaker phone, cuz I even said, told them[,] [']What's going on? Every time you say everybody's ready; you're ready, everybody's ready. Then it changes. You screw everybody else. Then you do it [a]gain.[']"

During their second conversation, on November 16, 2005, Kent and Freedman discussed whose car they should use to transport the cocaine from the

9

marina to the stash place. Kent concluded that it would be better to use his pickup truck instead of Freedman's sedan, reasoning that "if they send [the cocaine] in bales[,] there's no way I'm going to be able to get it in your car." Kent and Freedman then discussed what percentage of the cocaine Freedman should expect to receive as payment for his help. Kent told Freedman to expect approximately 10%, and Freedman lamented that the person to whom he expected to sell the cocaine was broke and that "[he'd have] to sell them in onesys and twoseys."

At the close of the government's case in chief, Freedman moved for a judgment of acquittal, pursuant to Fed.R.Crim.P. Rule 29, on all counts on the grounds that there was insufficient evidence that he conspired with Deveaux to import cocaine or attempted to import cocaine. The district court denied the motion.

Freedman testified that he owed Taylor $30,000 from a previous real estate deal. When Taylor indicated that he needed his help and the use of the boat for a drug deal, he refused and told Taylor that he had no familiarity with dealing drugs. When Freedman refused to help, Taylor threatened to sue Freedman for repayment of the $30,000. Freedman continued to refuse, but Taylor pressed the threat of legal action. Not having $30,000 with which to repay Taylor and fearful of being sued, Freedman agreed to help with the drug transaction. Accordingly, Taylor

10

instructed Freedman to meet with Kent to discuss the procedure for stashing the cocaine. Taylor told Freeman everything he needed to say to Kent and instructed him to otherwise just "go along with whatever [Kent] says." Thus, everything that Taylor said in the ensuing meetings with Kent was said simply to keep Taylor happy. Moreover, throughout his discussions with Taylor, Freedman did not believe that Taylor intended to import drugs. Indeed, Freedman ran into Taylor's brother and relayed Taylor's plan, and Taylor's brother "assured [Freedman] that [Taylor] was full of it." Thus, Freedman went along with Taylor's plan just to appease him.

At the close of Freedman's case in chief, he renewed his Rule 29 motion. The district court denied the motion.

We review attacks on the sufficiency of the evidence presented de novo, "viewing the evidence in the light most favorable to the government and drawing all reasonable inferences from the evidence in favor and in support of the jury verdict." United States v. Smith, 231 F.3d 800, 806 (11th Cir. 2000). We will uphold the jury's verdict against a sufficiency-of-the-evidence attack "unless no trier of fact could have found guilt beyond a reasonable doubt." United States v. Calderon, 127 F.3d 1314, 1324 (11th Cir. 1997). More specifically, we have explained that

11

> [i]t is not necessary that the evidence exclude every reasonable
> hypothesis of innocence or be wholly inconsistent with every
> conclusion except that of guilt, provided that a reasonable trier of fact
> could find that the evidence established guilt beyond a reasonable
> doubt. A jury is free to choose among the constructions of the
> evidence.

Id. We also have held that"[c]redibility determinations are the exclusive province of the jury." Id. at 1325.

To prove a conspiracy to import cocaine under § 952, the government must demonstrate that (1) an agreement existed between two or more people to commit a crime, (2) the accused had knowledge of at least the essential objectives of that agreement, and (3) the accused voluntarily joined or participated in the illegal venture. United States v. Battle, 892 F.2d 992, 999 (11th Cir. 1990). The two people who agree to commit the crime cannot be government agents or informers. United States v. Elledge, 723 F.2d 864, 866 (11th Cir. 1984). "Inferences from the conduct of the alleged participants or from other circumstantial evidence of a scheme may provide the basis for establishing that a conspiratorial agreement existed." Battle, 892 F.2d at 999. Likewise, conversations between the defendant and government agent or informer may constitute evidence of a conspiracy between the defendant and another. Elledge, 723 F.2d at 866.

To prove attempt to import cocaine under § 952, the government must demonstrate that the defendant (1) had a specific intent to engage in criminal

12

conduct and (2) took a substantial step toward commission of the offense. United States v. Carrasco, 381 F.3d 1237, 1242 (11th Cir. 2004) (reviewing convictions of attempt to possess with intent to distribute five kilograms or more of cocaine, pursuant to 21 U.S.C. § 846).

The government presented sufficient evidence to support Freedman's conspiracy and attempt convictions. See Smith, 231 F.3d at 806. It was not unreasonable for the jury to conclude, based on the circumstantial evidence presented, that an agreement existed between Freedman and Deveaux to commit a crime. See Calderon, 127 F.3d at 1324; Battle, 892 F.2d at 999; Elledge, 723 F.2d at 866. This evidence demonstrated that Deveaux and Freedman each were aware of the other's participation and role in the scheme. For instance, Taylor told Deveaux that others would be involved in offloading and stashing the cocaine once it arrived in the United States. Also, Freedman knew someone in the Bahamas was supplying the cocaine for transportation to the United States. Likewise, Kent told Freedman that Deveaux claimed that the delays were Taylor's fault and warned Freedman that the Bahamians were really slow. Furthermore, Freedman told Kent that he had overheard conversations between Taylor and Deveaux and even spoke with Deveaux on speaker phone about the delays and amount changes. From this evidence, a reasonable juror could conclude that Deveaux and Freedman were

13

parties to an agreement to import cocaine.  See Calderon, 127 F.3d at 1324.

It also was not unreasonable for the jury to conclude, based on the direct evidence presented, that Freedman intended to import cocaine and took a substantial step toward doing so.  See Calderon, 127 F.3d at 1324; Carrasco, 381 F.3d at 1242.  This evidence demonstrated that Deveaux wished to help import cocaine, provided the tools to do so, and was involved in the transportation of the cocaine to the United States.  When Taylor told Freedman about the drug deal, Freedman stated that he wanted in on the deal.  Also, Freedman let Taylor use the boat to travel to the Bahamas to retrieve the cocaine.  Furthermore, Freedman came to the marina on the day that Taylor was meant to retrieve the cocaine.  From this evidence, a reasonable juror could conclude that Freedman intended to import cocaine and did whatever was in his power to ensure that the cocaine was imported.  See Calderon, 127 F.3d at 1324.

Regarding Freedman's argument that the government did not prove that he conspired or attempted to import five kilograms or more of cocaine specifically, it was not unreasonable for the jury to conclude, based on the circumstantial evidence presented, that Freedman knew that this amount of cocaine was involved.  See Calderon, 127 F.3d at 1324.  Taylor told Freedman that he expected to earn $200,000 to $250,000 from the deal, and Deveaux expected that the cocaine would

14

sell for $17,000 to $17,500 per kilogram in the United States. From this evidence, the jury could have concluded that Freedman knew more than 5 kilograms of cocaine were involved because, even if Taylor were to sell all of the cocaine rather than a percentage, he would need to sell at least 11 kilograms at Deveaux's expected rate to earn this amount of money. Also, Freedman told Taylor that "the last time they said there were 7. . . ." From this evidence, the jury could have concluded that the Bahamians had indicated that they would send seven kilograms of cocaine.

Furthermore, Kent told Freedman that the cocaine would not fit in his sedan. From this, the jury could have concluded that Freedman knew to expect more than five kilograms of cocaine because anything less likely would have fit in his sedan. Moreover, Kent told Freedman that he would likely receive 10% of the cocaine to sell, and Freedman told Kent that he would have to sell his in "onesys and twoseys." From this, the jury could have concluded that Freedman knew that more than five kilograms of cocaine were involved because, assuming that "onesys and twoseys" referred to one- and two-kilogram lots, the total shipment would have had to equal more than five kilograms in order for his 10% allotment to be divisible into one-and two-kilogram lots. Finally, although Deveaux testified that he never intended to ship more than three kilograms of cocaine, the jury reasonably

15

could have rejected this testimony.  See <u>Calderon</u>, 127 F.3d at 1325.  Thus, because the government offered sufficient evidence that Freedman agreed to import five kilograms or more of cocaine and attempted to import five kilograms or more of cocaine, we affirm his convictions and sentences.  See <u>Smith</u>, 231 F.3d at 806.

**AFFIRMED.**